

The following constitutes the order of the Court.
Signed: November 5, 2021

_____
**Stephen L. Johnson
U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>MORDECHAI KOKA,<br><br>        Debtor. | Case No.: 20-50469 SLJ<br>Chapter 11<br><br>Date: November 4, 2021<br>Time: 1:30 p.m.<br>Ctrm: 9 (Remote) |

## ORDER AFTER HEARING ON APPROVAL OF DISCLOSURE STATEMENT
## (DEBTOR/GARDNERS JOINT PLAN)

The court held a hearing on approval of the disclosure statement portion of the Combined Plan of Reorganization and Disclosure Statement proposed by Debtor and Dale and Melissa Gardner dated October 1, 2021 ("Joint Plan"), at the above-referenced date and time. Appearances were noted on the record. The court indicated at the hearing it would issue an order detailing the disclosure defects with the Joint Plan. The court found the following errors and/or issues in the Joint Plan:

    1. Generally, most of the issues stem from the newly created Part 8, which is confusing and internally inconsistent. Provisions in Part 8 are also inconsistent with provisions in other parts of the Joint Plan, as noted in detail below. It appears the intention of Debtor/Gardners is to

have the three real properties and/or the proceeds thereof remain in the post-confirmation estate subject to disbursement by the disbursing agent while the remainder of the estate vests in Debtor upon confirmation. If this is so, the court suggests Part 8 be amended to begin with the definition of the post-confirmation estate, i.e., what comprises the post-confirmation estate, and perhaps use a capitalized term such as "Post-Confirmation Estate" to reference it in the Joint Plan. The sections following the definition may then provide the disbursing agent with exclusive control of the Post-Confirmation Estate and that property not included in the Post-Confirmation Estate vests in Debtor upon confirmation. Specific problems are noted below.

2. Part 7(f) Lawsuits: This newly added paragraph states "Debtor shall have the right, post-confirmation, to pursue any and all causes of action, whether or not set forth in Section 7(f) of the Plan or otherwise listed in any of the bankruptcy schedules filed by Debtor in this case." This conflicts with Part 8(e) which states this power belongs to the disbursing agent. See below for problems with Part 8.

3. Part 7(j) Cash Collateral Vests in Disbursing Agent: This provision states that all postpetition cash collateral will vest in the Disbursing Agent, "free and clear of all liens, claims, interest, and encumbrances." A similar provision was included in the previous version of the Joint Plan except that the cash collateral vests in Debtor. As the court stated in the order on the previous Joint Plan (DKT 234), this provision essentially avoids a secured creditor's valid and perfected security interest in cash collateral, which the court may not have authority to do, especially given the allegations that Debtor has been using cash collateral without authorization. To the extent this provision is not lawful, the Joint Plan may be facially unconfirmable.

4. Part 8(a)(ii): This provision states that the disbursing agent "shall have exclusive management, control, and authority over the entire post-confirmation estate and all assets of the bankruptcy estate that remain vested in the estate." As noted earlier, the post-confirmation estate is not defined until the next section, but given what constitutes the post-confirmation estate in Part 8(a)(iii), the court is unclear what is the difference between "the entire post-confirmation estate" and "all assets of the bankruptcy estate that remain vested in the estate" in this provision. They appear to be duplicative.

5. Part 8(a)(iii): Although the heading is titled "Post-Confirmation Estate," the words "post-confirmation estate" do not appear in the text of this section, which provides that upon confirmation the three real properties and/or their proceeds/cash collateral vest in the bankruptcy estate and that all other property vests in Debtor. It begs the question what exactly constitutes the "post-confirmation estate" as that phrase is used in other parts of the Joint Plan.

6. Part 8(e): This subsection defining the disbursing agent's powers is inconsistent with Part 8(a). Bullet point #5 states the disbursing agent has powers of a trustee including "asserting any and all causes of action held by the estate" and bullet point #6 states the disbursing agent has the right and standing "to pursue, defend, settle, or abandon any litigation claims." However, the court's reading of Part 8(a) is that the disbursing agent has control of only the real properties and their proceeds and not of other causes of action or claims. This provision also directly contradicts Part 7(f) which provides that Debtor has the post-confirmation right to pursue any and all causes of action.

7. Part 8(f): In the second paragraph, it states that a 10-day notice will be provided to parties identified in Part 7(j), but Part 7(j) pertains to vesting of cash collateral.

8. Part 8(j)(i): This section requires Farsad Law Office to turn over the proceeds from the sale of the Napa Property to the disbursing agent "within three (3) days after entry of an order confirming this Plan." It conflicts with Part 8(b), which requires the turnover "immediately after entry of an order confirming the Plan."

9. Exhibit 6 includes additional provisions. One of the provisions is that Debtor will be solely responsible for the capital gains taxes incurred by the sale of the three real properties and that the disbursing agent shall not deduct any taxes due from the sale of the real properties. The plan proposed by the Hannas included the identical provision, and Debtor objected to it, asserting that this provision makes the Hannas' plan not feasible on its face because Debtor is left with over $590,000 in taxes without the means to pay them. Since the Joint Plan contains the identical provision, it appears Debtor is conceding that the Joint Plan is also facially infeasible.

The court has also reviewed the objection filed by the Hannas and joined by Allan and Nicole Hulgan. The objection mainly takes issue with the lack of substantiation in the valuations of the Lafayette Property and the Alameda Property and the lack of evidence to support Debtor's alleged income from new employment. The Joint Plan included footnotes that indicate the value of the Lafayette Property is based on a realtor's opinion and the value of the Alameda Property is from the sale price in the now-withdrawn motion to sell. This is sufficient from a disclosure perspective. The fact that the Hannas' real estate expert had a different opinion of value is not a disclosure issue but a confirmation issue. The verification of Debtor's employment status and income is likewise a confirmation issue. Accordingly, the objection is overruled without prejudice to the Hannas, or other parties, raising it at confirmation.

Lastly, as the court has stated on the record at various hearings, Debtor must address certain issues before the court will confirm a plan proposed by Debtor. Debtor filed amended schedules and a declaration (DKTs 229 and 230) that addressed some of these issues. However, two significant issues remain unaddressed. First, Debtor has not addressed the allegation that he used the cash collateral of the Alameda Property without authorization, and from the monthly operating reports, it appears that Debtor continued to use the cash collateral as recently as August 2021 even after the allegations were raised in June 2021. Debtor has also been vague in providing information of his employment, unwilling to provide information such as the identity of his employer, the nature and location of the employment, and the duration of the employment, despite repeated requests from the Hannas and the court to provide such details.[1] In revising the disclosure statement and plan, Debtor should be mindful that the court will not confirm any plan proposed by Debtor until these issues are resolved.

---

[1] One declaration from Debtor (DKT 172) states that the job started in late June with a salary of $15,000 per month, but in another declaration filed three months later (DKT 238), Debtor states that the salary is $12,000 per month and he received his first check in September. There is no explanation for the discrepancy. Consistent with Debtor's vagueness, the latest monthly operating report for September shows $14,200 in cash receipts described as "Deposits from odd jobs."

Debtor/Gardners shall make the changes to the Joint Plan noted above by December 3, 2021. Objections shall be filed by December 30, 2021. The hearing on approval of the disclosure statement portion of the Joint Plan is continued to January 13, 2022, at 1:30 p.m.

IT IS SO ORDERED.

*** END OF ORDER***

# COURT SERVICE LIST

**[ECF Recipients]**