**MEYER LAW GROUP LLP**
  A Limited Liability Partnership
BRENT D. MEYER, Cal. Bar No. 266152
268 Bush Street #3639
San Francisco, California 94104
Telephone:  (415) 765-1588
Facsimile:   (415) 762-5277
Email:        brent@meyerllp.com

Attorney for Plan Proponent
DALE GARDNER and
MELISSA GARDNER

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | BK Case No.: 20-50469-SLJ |
| MORDECHAI KOKA, | Chapter 11 |
| Debtor. | **BRIEF IN SUPPORT OF CONFIRMATION OF JOINT COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT (JANUARY 24, 2022)** |
| | Date:       April 7, 2022<br>Time:       1:30 p.m.<br>Location: Telephonic / Videoconference[1]<br>Judge:      Hon. Stephen L. Johnson |

---

[1] Paragraph 10 of General Order 38 (Seventh Amended) provides that "[u]nless otherwise ordered by the presiding judge, all notices of any motion or application filed with the court and served on any party which sets a hearing date for the motion or application must state that the hearing will not be conducted in the presiding judge's courtroom but instead will be conducted by telephone or video, and include the following language: 'All interested parties should consult the Bankruptcy Court's website at www.canb.uscourts.gov for information about court operations during the COVID-19 pandemic. The Bankruptcy Court's website provides information regarding how to arrange a telephonic or video appearance. If you have any questions regarding how to appear at a court hearing, you may contact the Bankruptcy Court by calling 888-821-7606 or by using the Live Chat feature on the Bankruptcy Court's website.'" See *https://www.canb.uscourts.gov/sites/default/files/generalorders/SeventhAmendedGO38.pdf*.

Debtor Mordechai Koka ("Debtor") and plan proponents Dale Gardner and Melissa Gardener (the "Gardners") (collectively, the "Plan Proponents") hereby submit this brief in support of confirmation of the *Joint Combined Plan of Reorganization and Disclosure Statement (January 24, 2022)* [Dkt. No. 294] (the "Plan") in the above-captioned matter (the "Bankruptcy Case").

This brief is based upon the supporting memorandum of points and authorities set forth below, the supporting declarations of Mordechai Koka, Dan Shaw, Richard Dahnken, and Brandon Koka (the "Confirmation Decls.") and all exhibits attached thereto, all other pleadings on file herein, and such other and further arguments and authority as may be presented at the hearing on confirmation.

## I. Relevant Facts

### A. Background Facts

As Debtor has previously explained, "[t]his case was commenced with the filing of a petition under Chapter 11 on March 10, 2020" and "[t]he Debtor filed the instant case to stop the non-judicial foreclosure of his real property located at 858 Acalanes Road, Lafayette, CA 94549."

Debtor was the sole shareholder of Green Bay Builders, Inc. ("GBBI"), which operated a business as a general contraction under California Contractors State License Board ("CSLB") License No. 1015144. Debtor utilized the license of another general contractor (as RMO) to conduct business. However, for various reasons, including the COVID-19 global pandemic, in late 2020, Debtor ceased business operations of GBBI and elected to file for protection under the Bankruptcy Code in order to allow for an orderly administration with various creditors.

### B. Relevant Events in the Bankruptcy Case

On March 10, 2020, Debtor commenced a voluntary petition for relief under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Case"). See Dkt. No. 1.

On August 7, 2020, this Court approved sale of the Vichey Property, which generated net proceeds of sale of approximately $198,502.31. See Dkt. No. 76, 105.

On April 16, 2021, the Gardners filed a creditors plan of reorganization. See Dkt. No. 114.

On April 20, 2021, and primarily in response to the Gardners' proposed plan of reorganization, Debtor terminated the services of prior counsel, and retained the Fuller Law Firm, P.C. to represent the estate. See Dkt. No. 116. Thereafter, on May 3, 2021, Debtor elected to convert the Bankruptcy Case to

a case under Sub-Chapter V. See Dkt. No. 121.

After contested litigation, the Court determined that Debtor was not eligible to proceed under Sub-Chapter V and converted the Bankruptcy Case back to regular Chapter 11. See Dkt. No. 179.

Upon conversion back to regular Chapter 11, Debtor and the Gardners determined that it was in the best interest of the estate and all parties in interest to propose a joint plan of reorganization. To this end, on July 20, 2021, the Plan Proponents filed the first iteration of the joint plan. See Dkt. No. 193.

After several hearings on approval of the disclosures set forth in the joint plan, along with consideration of a competing plan proposed by the Hannas, the Court ultimately approved those disclosures set forth in the *Joint Combined Plan of Reorganization and Disclosure Statement (January 24, 2022)* (the "Plan"). See Dkt. No. 294.

The Plan Proponents now jointly seek confirmation of the Plan as follows.

**C.     Joint Plan of Reorganization**

The Plan provides for four classes of voting creditors, which constitute the only impaired classes in the Plan. There are no classes of unimpaired claims under the Plan.

The Plan also provides for three groups of unclassified claims:

- Part 3(a)-(b): Administrate Expenses under 11 U.S.C. § 503(b) (if allowed)
- Part 3(c): Priority Tax Claims under 11 U.S.C. §§ 507(a)(8) (if allowed)
- Part 3(d): Priority Security Deposits under 11 U.S.C. §§ 507(a)(7) (if allowed)

Allowed claims for each of these unclassified groups will be paid in full consistent with the terms and conditions of the Plan.

Further, an essential feature of the Plan is appointment of a neutral fiduciary (the Disbursing Agent), whom is tasked with promptly and expeditiously liquidating certain property, making distributions to creditors, and closing the Bankruptcy Case. Given the unique circumstances of this case, appointment of the Disbursing Agent will allow for prompt resolution, limited litigation (if any), and considerably less administrative fees because the Disbursing Agent will be compensated on an hourly basis and not pursuant to the commission schedule set forth in section 326.

**D.     Required and Available Funding for Plan Payments**

Under the Plan, there are five categories of claims that will be satisfied from various sources.

First, Class 1(A) is the secured claim of HSBC Bank, USA, N.A. with a first priority Deed of Trust secured against the Acalanes Property. Based on a recent payoff demand received from escrow, the amount required to pay this claim is $1,044,275.72, which will be paid in full at close of escrow from the sale of the Acalanes Property. The highest and best offer for the Acalanes Property is $1,690,000 (see Dkt. No. 299), which if approved by this Court, will be more than sufficient to satisfy the Class 1(A) claim of HSBC Bank, USA, N.A.

Second, Class 1(B) is the secured claim of Deutsche Bank, N.A. with a first priority Deed of Trust secured against the Paru Property, and Class 1(C) is the secured claim of Citibank West, FSB secured by a second priority Deed of Trust on the Paru Property.

Under the Plan, Debtor will pay the estimated arrears ($4,662.02) to Deutsche Bank, N.A. thirty days after the Effective Date, and thereafter Debtor will make monthly payments of $5,519.60 to Deutsche Bank, N.A. and $569.99 to Citibank West, FSB. for total monthly payments of $6,089.59.

The source of funds for the pre-petition arrears ($4,662.02) are from available cash reserves, and the source of funds for the post-confirmation obligations ($6,089.59 / month) will be from a combination of rental income, Debtor's employment income, and to the extent necessary, assistance from Debtor's children. Further, to the extent Debtor anticipates he will have insufficient monthly resources to satisfy these plan obligations, given the equity cushion in the Paru Property, Debtor would simply elect to sell the property and pay the entire Class 1(B) and Class 1(C) claims in full.

Third, Class 2 claims of general unsecured claims will be satisfied from three sources: (a) remaining net proceeds of sale (at least $10,000) from the Vichey Property; (b) net proceeds of sale (minimum of $525,000) from the Acalanes Property; and (c) reside of the estate (if any) after payment of all other claims set forth in the Plan. Given that the current offer to purchase the Acalanes Property will generate sufficient net proceeds of sale to satisfy the requirement for Class 2 claimants, at this time, it is not anticipated that the Disbursing Agent will be required to sell the Paru Property.

Fourth, Class 3 is comprised of all administrative claims, which in the Plan are estimated to be in the approximate amount of $69,717, although the exact amount of these claims likely will be slightly higher given the difficulties in bringing the Plan to confirmation. At present, there are net proceeds of sale from the Vichey Property of $99,732.31 in the IOLTA attorney-client trust account for Debtor's

former counsel, and Debtor's current counsel holds a $30,000 post-petition in its IOLTA attorney-client trust account. The combination of these funds ($129,732.31) along with the available cash balance (approximately $29,904) in the DIP account, will be more than sufficient to satisfy all duly allowed administrative claims in full, including the claim of the Disbursing Agent.

Fifth, although not technically a payment required by the terms of the Plan, Debtor anticipates that the estate will incur capital gains taxes of approximately $167,514 from sale of the Acalanes Property and the Vichey Property, although the precise amount will vary slightly depending on the actual tax basis for the properties taking into account all capital modifications and additions. These taxes will not be due and payable until April 15, 2023 to the Internal Revenue Service (IRS) and Franchise Tax Board (FTB), and Debtor anticipates these taxes will be paid through a combination of monthly employment income, and if necessary, an available equity line in the aggregate amount of $200,000 secured by a third priority Deed of Trust on the Para Property. See Shaw Decl., ¶ 5, Exh. 1.

## II. Objection to Confirmation Filed by Jeff and Amalia Hanna

The only timely objection to confirmation of the Plan (the "Objection") was filed by creditors Jeff and Amalia Hanna (the "Hannas"). See Dkt. No. 302. Although it is difficult to ascertain the exact nature of their argument, it appears that the objection is based on plan feasibility related to Debtor's employment income. This objection is without merit and should be summarily overruled.

First, as this Court previously explained to the Hannas, with respect to the general unsecured claim of the Hannas provided for in Class 2 of the Plan, Debtor's monthly income is wholly irrelevant, as the Hannas will receive *pro-rata* distributions from three sources: (a) net proceeds of sale from the Vichey Property; (b) net proceeds of sale from the Acalanes Property (minimum of $525,000), and to the extent that the Disbursing Agent does not obtain sufficient funds, then from sale of the Paru Property; and (c) the residue of the estate. See Dkt. 294, Class 2 (pp. 5-6), Part 8. The Hannas *will not* receive any distributions on account of Debtor's post-confirmation monthly income.

As such, Debtor's post-confirmation monthly income is wholly irrelevant to payment of all Class 2 claims, including the Hannas' claims.

Second, the only "payments" required under the Plan that will be derived in part from post-confirmation income are payments to secured creditors in Class 1(B) (Deutsche Bank, N.A.) in the

monthly amount of $5,519.60 and Class 1(C) (Citibank West, FSB) in the monthly amount of $569.99 for the Para Property. See Dkt. No. 294, p. 3-4. As such, these are the only 2 creditors that could assert a legitimate objection to the relevancy of Debtor's post-petition monthly income.

Remarkably, however, Deutsche Bank, N.A. holding the largest claim of these classes, actually voted to accept the Plan and does not share the same feasibility concerns expressed by the Hannas.

Third, as set forth in Exhibit C of the Plan, and in further detail in the Declaration of Mordechai Koka (Paragraphs 14-19) filed in support of confirmation of the Plan, Debtor anticipates that he will have net disposable income of at least $1,478, and depending on the month, perhaps as high as $4,478, which already takes into account all monthly plan payment due and owing under the Plan.

As such, Debtor has provided this Court with sufficient and credible evidence demonstrating that he will have sufficient post-confirmation income to make all required payments under the Plan.

Fourth, as set forth in detail in the supporting declaration of Brandon Koka, Debtor's son has sufficient financial means and has also indicated his willingness to provide monthly assistance to his father in an amount not less than $1,000.00, to the extent necessary to fund any possible shortfall in monthly plan payment.

Fifth, although technically not relevant to resolving the Objection because the Hannas only raised feasibility with respect to plan payments from monthly income, Debtor has accepted an offer for the Acalanes Property, which is anticipated to generate net income for Class 2 creditors in the approximate amount of $538,112.53. See Dkt. No. 299; Koka Decl. ¶ 6. This amount is more than sufficient to satisfy the funding requirements for Class 2 claims. See Dkt. 294, pp 5-6.

Based on the foregoing, the Court should summarily overrule the Objection in its entirety.

**III. Statutory Requirements for Confirmation of the Plan**

**A. 11 U.S.C. § 1129(a)(1)**

Section 1129(a)(1) requires that "[t]he plan complies with the applicable provisions of this title. 11 U.S.C. § 1129(a)(1). "[T]he legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans." Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2nd Cir. 1988). "In determining whether a plan complies with

section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to classification of claims and the contents of a plan of reorganization." In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988). As discussed in detail below, the Plan satisfies the requirements of both sections 1122 and 1123.

### i. 11 U.S.C. § 1122

A plan proponent has broad discretion to adopt classification schemes in a plan of reorganization. See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154 (3rd Cir. 1993); Hanson v. First Bank, 828 F.2d 1310, 1313 (8th Cir. 1987); In re Jersey City Medical Ctr., 817 F.2d 1055, 1060-61 (3rd Cir. 1987) (chapter 9 case applying 11 U.S.C. § 1122); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 584-86 (6th Cir. 1986). As the Eleventh Circuit has explained, a "proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case." Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990).

Further, the only restriction in the Bankruptcy Code on the creation of classes is section 1122(a), which provides that a plan may place a claim or an interest in a particular class only if the claim or interest is "substantially similar" to other claims or interest in the class. See 11 U.S.C. § 1122(a). The only other limitation on classification is a prohibition against separately classifying certain claims solely to satisfy the requirement of section 1129(a)(10) that at least one impaired class of claims votes to accept the plan. See Steelcase, Inc. v. Johnston (In re Johnston), 140 B.R. 526, 529 (B.A.P. 9th Cir. 1992) *aff'd* 21 F.3d 323 (9th Cir. 1994) (because the "record [did] not establish that the separate classification of [the objector's] claim was proposed to secure the vote of an impaired class of claims," the court upheld the plan's classification scheme); see also U.S. Truck, 800 F.2d at 586.

Here, the classification of claims in the Plan is very simple and not for the purpose of manipulating the outcome of the creditors' votes or for any other inappropriate purpose. All secured claims are placed in separate classes, all priority claims are placed in two classes, and all general unsecured claims are placed in one class, and all executory contracts and unexpired leases not specifically accepted are rejected under the Plan. See Docket No. 294.

Each of the classes established under the Plan are wholly consistent with the principles that govern section 1122, were established based on claims that are "substantially similar" to other claims within the respective class, and were not established for an improper purpose.

### ii. 11 U.S.C. § 1123(a)

First, section 1123(a)(1) requires that a plan designate classes of claims, other than claims of a kind specified in section 507(a) (administrative expense claims), section 507(a)(2) (involuntary "gap" period claims), section 507(a)(7) (tax claims), and classes of interests. See In re Haardt, 65 B.R. 697, 700 (Bankr. E.D. Pa. 1986). Part 3 of the Plan designates classes of claims and of interests in accordance with § 1123(a)(1). Part 4 describes how all claims are provided for by the Plan, including administrative claims, although such claims are not classified. As such, the Plan satisfies the requirements of section 1123(a)(1).

Second, section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2).

Under section 1124, a class of claims is impaired unless each claim in that class is treated in one of the following ways: (1) the plan leaves unaltered the legal, equitable and contractual rights to which the holder of such claim is entitled; (2) the plan cures any default, reinstates the maturity, compensates the holder for damages and does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder; or (3) on the effective date of the plan, the holder of such claim receives on account of such claim, cash equal to the allowed amount of the claim. See 11 U.S.C. § 1124.

Here, there are no classes of claims that are not impaired under the Plan.

Third, section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). Whether a claim or interest is "impaired" is determined pursuant to section 1124. See In re Mid Pacific Airlines, Inc., 110 B.R. 489, 491 (Bankr. Haw. 1990). Generally, a class of claims or interests is impaired unless it is treated in accordance with one of the two criteria specified in section 1124.

Here, there are three classes of secured claims (Class 1(A), 1(B), and 1(C)) that are impaired under the Plan, and one class of unsecured claims (Class 2) that impaired under the Plan, and the treatment for these claims are specified in the section corresponding to identification to such claim.

Fourth, section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." See In re Monroe Well Service, Inc., 80 B.R. 324, 336 (Bankr. E.D. Pa. 1987) (equality of treatment provision of § 1123(a)(4) only applies to claims placed in the same class). The Plan provides the same treatment for each claim contained in each of the classes under the Plan in compliance with section 1123(a)(4).

Fifth, section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth several examples of such adequate means. See In re Stuart Glass & Mirror, Inc., 71 B.R. 332, 334 (Bankr. S.D. Fla. 1987) (plan must provide adequate means for its execution). In accordance with section 1123(a)(5), means for implementing the Plan are set forth in Section 8 of the Plan, Exhibits 2-5 of the Plan, and the various means contained elsewhere in the Plan are adequate to enable the Reorganized Debtor to implement the Plan in compliance with section 1123(a)(5). See Confirmation Decls.

Part 1, Part 2, and Part 8 of the Plan also provides that the Plan shall be funded from cash on hand, net proceeds of sale from the Vichey Property, the Acalanes Property, and the Paru Property (if necessary). Further, cash on hand is sufficient to fund all payments due on the Effective Date of the Plan and the balance of the cash on hand is ample to provide sufficient funds to enable the Disbursing Agent to operate for the term of the Plan. See Confirmation Decls.

Based on the means for implementation of the Plan described above and elsewhere in the Plan, the Plan provides adequate means for its implementation in satisfaction of section 1123(a)(5).

    ii.    11 U.S.C. § 1123(b)

First, section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." As discussed above, all claims (secured and unsecured) provided for in the Plan are impaired.

Second, sections 365 and 1123(b)(2) permits a plan to provide for the assumption or rejection of any executory contract and unexpired lease not previously rejected. See 11 U.S.C. § 1123(b)(2). Further, Federal Rule of Bankruptcy Rule 6006(a) provides that the assumption or rejection or an executory contract or unexpired lease as a part of a plan is not governed by Bankruptcy Rule 9014. As

such, there is no requirements for a separate motion, notice, or hearing.

Part 4(a) of the Plan provides the specific executory contracts and unexpired leases that are assumed, and all other executory contracts and unexpired leases shall be rejected, although Debtor is unaware of any executory contract or unexpired lease that is not specifically identified in Part 4(a) and therefore rejected under the Plan.

Third, section 1123(b)(3)(B) provides that a plan may provide for "the retention and enforcement by the Debtor… of any… claim…". 11 U.S.C. § 1123(b)(3)(B). Here, the Disbursing Agent retains all claims and causes of action, although there are not relevant claims held by Debtor that are anticipated to be asserted. See Plan, Part 6(f).

Based on the foregoing, the Plan complies with both the classification provisions of section 1122 and the mandatory and permissive contents provisions of section 1123. As such, the Plan satisfies the requirements of section 1129(a)(1).

**B.     11 U.S.C. § 1129(a)(2)**

Section 1129(a)(2) requires that the proponent of the plan comply with "the applicable provisions" of title 11. See 11 U.S.C. § 1129(a)(2). In this context, the "applicable provisions" of title 11 are section 1121 (who may file a plan), section 1125 (solicitation of acceptances of a plan), and section 1127 (modification of a plan). See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Sections 1121(a) and (c) permit a Debtor to file a plan of reorganization, and section 1121(c) allows for a creditor to file a plan of reorganization under certain circumstances. See 11 U.S.C. § 1121. Here, the Plan has been jointly proposed by Debtor and the Gardners.

One of the principal purposes of section 1129(a)(2) is to ensure that proponents have complied with the requirements of section 1125 in the solicitation of acceptances of a plan of reorganization. See In re Jeppson, 66 B.R. 269, 296 97 (Bankr. Utah 1986); In re Toy & Sports Warehouse, Inc., 37 B.R. at 149 ("the Proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with §§ 1125 and 1126."). Here, neither Debtor nor the Gardners never sought solicitation of acceptance of the Plan until after such time that this Court approved the disclosure statement set forth in the Plan.

C.   **11 U.S.C. § 1129(a)(3)**

Section 1129(a)(3) requires that the plan has been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

Although the term "good faith" is left undefined by the Bankruptcy Code, "[i]n the context of a chapter 11 reorganization . . . a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Hanson v. First Bank of South Dakota, 828 F.2d 1310, 1315 (8th Cir. 1987) (*quoting* In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)) ("[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code"); see also In re Corey, 892 F.2d 829, 835 (9th Cir. 1989); In re Stolrow's Inc, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) ("[g]ood faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code.") Further, courts have generally held that the "good faith" requirement should be considered in light of the totality of circumstances. See In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) ("[t]he requisite good faith determination is based on the totality of the circumstances").

Here, the Bankruptcy Case was filed initially to stop the imminent non-judicial foreclosure sale on the Acalanes Property and preserve the equity in the property for the benefit of the estate. Thereafter, as this Court is well aware, there was significant contested litigation related to many issues, but ultimately, Debtor and the largest general unsecured creditor (the Gardners) collectively determined that is was in the best interest of all creditors and the estate to work cooperatively on a joint plan of reorganization with three principles in mind.

First, the Plan Proponents wanted to establish a streamlined process for administration of the post-conformation estate, which would allow for prompt liquidation of certain property of the estate and prompt payment of a *pro-rata* distribution to general unsecured creditors.

Second, the Plan Proponents wanted to appoint a neutral third-party (the Disbursing Agent) to promptly and effectively administer the post-confirmation estate and eliminate all issues with holding funds in trust and making distributions to claimants as required by the Plan.

Third, the Plan Proponents wanted to provide a dividend to general unsecured creditors which was significantly larger than under a Chapter 7 liquidation, which was accomplished by Debtor

voluntarily agreeing to a larger payment to Class 2 claimants, waiver of Debtor's homestead exemption, Debtor to pay for all applicable capital gains taxes, and appointment of the Disbursing Agent who would be compensated on an hourly basis and not pursuant to the commission schedule set forth in section 326 for Chapter 7 and Chapter 11 trustees.

With these three principles in mind, along with all other protective mechanisms in the Plan to ensure effective and prompt administration, the Plan was clearly proposed in good faith and not by any means forbidden by applicable law. This conclusion is bolstered by the fact that Debtor and the largest unsecured creditor (the Gardners) jointly proposed the Plan, which was universally accepted by all creditors that affirmatively voted on the Plan.

As such, the Plan complies with the requirements of section 1129(a)(3).

### D. 11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) provides "[a]ny payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) is directed primarily at policing the award and payment of professional fees from the estates in Chapter 11 cases. See 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 2015) ("[s]ection 1129(a)(4) requires that the bankruptcy court exercise substantive control over fees and costs related to confirmation and the chapter 11 case").

Here, Part 3 of the Plan provides for payment of all administrative claims on the Effective Date or upon approval by this Court, whichever is later. See In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("[c]ourt approval of payments for services and expenses is governed by various Code provisions e.g., §§ 328, 329, 330, 331, and 503(b) and need not be explicitly provided for in a Chapter 11 plan"); In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where plan provided for payment of only "allowed" administrative expenses).

### E. 11 U.S.C. § 1129(a)(7)

Section 1129(a)(7) sets forth the "best interest of creditors" test, which in relevant party requires

that "each holder of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7).

Under the Plan, there are 4 classes of impaired claims (Class 1(A), Class 1(B), Class 1(C), and Class 2), and each class that actually voted (Class 1(A), Class 1(B), and Class 2), all accepted the Plan. The only class that did not affirmatively accept the Plan was Class 1(C) (Citibank West, FSB), which has not participated the Bankruptcy Case and not surprisingly did not cast a vote.

Further, as set forth in detail in Exhibit 2 of the Plan, the anticipated distribution to general unsecured claims is approximately $553,854 (35.34%) under the Plan, whereas the anticipated liquidation amount under a hypothetical Chapter 7 is approximately $254,472.71 (16.28%). See Dkt. No. 294, Exh. B. As this Court is well aware, there is a pending objection to Debtor's asserted homestead exemption in the Acalanes Property, and even if this amount ($75,000) was included in the liquidation amount, general unsecured creditors would only receive approximately $329,472.71 ($254,472.71 + $75,000) (21.02%), which is considerably less than proposed amount under the Plan.

As such, three out of four impaired classes have affirmatively and unanimously accepted the Plan, and general unsecured creditors will receive a dividend payment of approximately $299,381.29 (19.06%) more under the Plan compared with the dividend in a hypothetical Chapter 7 liquidation. Further, since the Disbursing Agent will be making these distributions, payments to general unsecured creditors will happen much more expeditiously than if the estate were liquidated by a Chapter 7 trustee.

**F.     11 U.S.C. § 1129(a)(8)**

Section 1129(a)(8) requires that each class of claims and interests either has accepted the Plan or is not impaired under the Plan. See 11 U.S.C. § 1129(a)(8). Here, as set forth above, Class 1(A), Class 1(B), and Class 2 are the only classes that actually voted, and each of these classes affirmatively and unanimously accepted the Plan. However, Class 1(C) did not vote on the Plan, and as such, is deemed not to affirmatively accept the Plan, and as such, the Plan Proponents must satisfy the requirement of section 1129(b) to confirm the Plan.

Section 1129(b)(1) provides that "if all of the applicable requirements of subsection (a) of this

section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

Further, pursuant to section 1129(b)(2)(A)(i), with respect to secured claims that have not accepted the Plan, the Plan must provide: (i) the creditor must retain its lien to the extent of its allowed claim; and (ii) the creditor must receive deferred cash payments totaling the allowed amount of its claim, of a value, as of the effective date of the plan. See 11 U.S.C. § 1129(b)(2)(A)(i).

Here, the only class that did not affirmatively vote to accept the Plan was Class 1(C), which is the secured claim of Citibank West, FSB secured by a second priority Deed of Trust on the Paru Property. In the Plan, this Class 1(C) will: (i) retain its lien on the Paru Property; (ii) have an allowed claim in the full amount the outstanding principal and interest due and owing (estimated at $153,000); (iii) interest will accrue at 3.25% per annum; and (iv) Debtor will make monthly payments of $569.99 in 480 equal monthly payments in full satisfaction of the claim. See Dkt. No. 294, p. 4.

Given the sizeable equity cushion in the Paru Property with respect to the Class 1(C) claim of Citibank West, FSB, given that Debtor will have cured all outstanding arrears (approximately $4,662.02) to the holder of the senior lien (Class 1(B) claimant) and will be contractually current with this obligation shortly after the Effective Date, given the limited risk (if any) to Citibank West, FSB with respect to its secured claim, and given that the proposed interest rate is compliant with the risk analysis in Till v. SCS Credit Corp., 541 U.S. 465 (2004), the Plan Proponents submit that treatment of the Class 1(C) claim of Citibank West, FSB is compliant with the requirements of section 1129(b)(2)(A)(i).

As such, notwithstanding that Class 1(C) did not vote and is deemed to reject the Plan, pursuant to section 1129(a)(1), this Court has authority to find that the proposed treatment of the Class 1(C) claim is fair and equitable and satisfies the requirements of section 1129(b)(2)(A)(i).

G.     **11 U.S.C. § 1129(a)(9)**

Section 1129(a)(9) contains provisions generally requiring immediate payment in cash of administrative and non-tax priority claims and permitting the deferred payment of priority tax claims over a period not exceeding five years. See 11 U.S.C. § 1129(a)(9).

Here, the Plan provides for payment in full in cash of each allowed administrative claims upon allowance by the Court or the Effective Date, which satisfies the requirements of section 1129(a)(9)(A). See Docket No. 294, Part 3(a)-(b). Further Part 3(c) of the Plan also provides for payment of all other priority tax claims (if any) over a period not exceeding five years and Part 3(d) provides for payment of priority security deposit claims upon surrender of the premises by the tenants. Id., at Part 3(c)-(d). As such, the Plan satisfies all of the requirements of section 1129(a)(9).

### H. 11 U.S.C. § 1129(a)(10)

Section 1129(a)(10) requires that at least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim in such class. See 11 U.S.C. § 1129(a)(10); see also In re Toy & Sports Warehouse, Inc., 37 B.R. at 151.

As set forth above, Class 1(A), Class 1(B), and Class 2 have *unanimously* and affirmatively voted to accept the Plan, which satisfies the requirements of section 1129(a)(10).

### I. 11 U.S.C. § 1129(a)(11)

Section 1129(a)(11) sets forth the feasibility requirements, which provides that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

Here, there are substantial grounds for the Court to find that the Plan meets the feasibility requirements.

First, Debtor has already sold the Vichey Property and prior counsel currently holds the net proceeds of sale ($99,732.31) in its IOLTA attorney-client trust account.

Second, Debtor has accepted the highest and best offer for the Acalanes Property, which if approved by this Court, will result in net proceeds of sale in approximate amount of $538,112.53, which is more than sufficient to pay the required amount to Class 2 claimants. See Dkt. No. 299.

Third, as set forth in Section II. above, rental income generated by the Paru Property, monthly post-confirmation employment income generated by Debtor, and in the unlikely event that it will be necessary, assistance from Debtor's son will produce more than sufficient monthly income to pay all obligations to Class 1(B) (Deutsche Bank, N.A.) in the monthly amount of $5,519.60 and all obligations

to Class 1(C) (Citibank West, FSB) in the monthly amount of $569.99 on account of the Para Property.

Fourth, as set forth in Section I.D. above, Debtor will have more than sufficient funds available to pay all administrate claims provided for in Part 3(a), Part 3(b), and Part 8 of the Plan.

Fifth, as set forth in Section I.D. above, although not technically a payment required by the terms of the Plan, Debtor anticipates that the estate will incur capital gains taxes of approximately $167,514 from sale of the Acalanes Property and the Vichey Property, which will be paid through a combination of monthly employment income, and if necessary, an available equity line in the aggregate amount of $200,000 secured by a third priority Deed of Trust on the Para Property. See Shaw Decl. ¶ 5, Exh. 1.

Based on the foregoing, the Plan likely will not be followed by liquidation or further need for reorganization. As such, the Plan is feasible and satisfies the requirements of section 1129(a)(11).

### J.  11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930 (consisting primarily of the quarterly fee to the United States Trustee) be paid on the effective date of the plan. See 11 U.S.C. § 1129(a)(12). Here, Debtor is current with all quarterly payments to the Office of the U.S. Trustee, as set forth in Exhibit 4 of the Plan, Debtor will have sufficient resources to make the quarterly payment due shortly after the Effective Date, and will have sufficient cash reserves to make subsequent payments prior to entry of the discharge and closure of the Bankruptcy Case.

### K.  Appointment of Disbursing Agent

As set forth in detail in Part 8 of the Plan, Debtor and the Gardners elected to appoint the very experienced fiduciary Janina Hoskins, whom currently serves as a panel Chapter 7 Trustee in the San Francisco Division, to act as the Disbursing Agent to take all necessary actions and make all required disbursements under the terms of the Plan. See Dkt. No. 294, Part 8. The parties have been in regular contact with Ms. Hoskins, whom is up-to-date with recent developments in the Bankruptcy Case, and it is anticipated that Ms. Hoskins is ready, willing, and able to accept appointment as the Disbursing Agent in the event that the Plan in confirmed.

### L.  Discharge of Debtor

Consistent with the requirements of section 1141(d)(5), pursuant to Part 5(a) of the Plan, Debtor is entitled to entry of his discharge upon payment by the Disbursing Agent and/or Debtor of all

payments required by the Plan. See 11 U.S.C. § 1141(d)(5)(A). The Plan does not seek to alter or modify the requirements of the delayed entry of discharge for an individual debtor in Chapter 11. See Dkt. No. 294, Part 5(a).

### M.  Resolution of All Related Litigation

To the extent that the Plan is confirmed, a significant amount of litigation will also be resolved, which inevitably will conserve valuable judicial resources, reduce administrative expenses of the estate, and allow Debtor the opportunity to obtain a discharge and a fresh start.

First, the Gardners initially objected to Debtor's claimed homestead exemption ($75,000) in the Acalanes Property. See Dkt. No. 145. Although this objection has not yet been resolved, and the Hannas joined and adopted all arguments raised by the Gardners, it will not be necessary for the Court to resolve this objection. Specifically, to the extent that the Plan is confirmed, Debtor has agreed to waive his homestead exemption ($75,000) and allow for all net proceeds of sale from the Acalanes Property to be distributed to Class 2 general unsecured creditors.

Second, the Gardners have commenced an adversary proceeding against Debtor and objected to the dischargeability of their claim pursuant to sections 523(a)(2), (a)(4), (a)(6). See Case No. 20-5030. However, as an accommodation to Debtor, the Gardners have voluntarily agreed to dismiss this adversary proceeding *with* prejudice if the Plan is confirmed.

These natural and intended consequences of confirmation of the Plan are clearly in the best interest of the estate and all creditors, and the totality of the circumstances, bolsters that the Plan was proposed in good faith consistent with the requirements of section 1129(a)(3) as set forth above.

///
///
///
///
///
///
///

## IV.  CONCLUSION

Based on the foregoing, Debtor and the Gardners respectfully request that the Court enter an order confirming the Plan, overrule the Objection submitted by the Hannas in its entirety, and for such other and further relief that is just and proper under the circumstances of this case.

Respectfully submitted

Dated: April 4, 2022         **MEYER LAW GROUP LLP**

By: /s/ BRENT D. MEYER
    Brent D. Meyer, Esq.
    Attorneys for Plan Proponents
    DALE GARDNER and
    MELISSA GARDNER

Dated: April 4, 2022         **THE FULLER LAW FIRM, PC**

By: /s/ LARS FULLER
    Lars Fuller, Esq.
    Attorneys for Debtor
    MORDECHAI KOKA