**MEYER LAW GROUP LLP**
  A Limited Liability Partnership
BRENT D. MEYER, Cal. Bar No. 266152
268 Bush Street #3639
San Francisco, California 94104
Telephone:  (415) 765-1588
Facsimile:  (415) 762-5277
Email:      brent@meyerllp.com

Attorney for Plan Proponent
DALE GARDNER and
MELISSA GARDNER

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re | BK Case No.: 20-50469-SLJ |
| MORDECHAI KOKA, | Chapter 11 |
| Debtor. | **FINAL BRIEF IN SUPPORT OF CONFIRMATION OF JOINT COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT (JANUARY 24, 2022)** |
| | Date:        October 13, 2022<br>Time:        9:00 a.m.<br>Location:    Telephonic / Videoconference[1]<br>Judge:       Hon. Stephen L. Johnson |

---

[1] Paragraph 10 of General Order 38 (Seventh Amended) provides that "[u]nless otherwise ordered by the presiding judge, all notices of any motion or application filed with the court and served on any party which sets a hearing date for the motion or application must state that the hearing will not be conducted in the presiding judge's courtroom but instead will be conducted by telephone or video, and include the following language: 'All interested parties should consult the Bankruptcy Court's website at www.canb.uscourts.gov for information about court operations during the COVID-19 pandemic.  The Bankruptcy Court's website provides information regarding how to arrange a telephonic or video appearance.  If you have any questions regarding how to appear at a court hearing, you may contact the Bankruptcy Court by calling 888-821-7606 or by using the Live Chat feature on the  Bankruptcy Court's website.'" See *https://www.canb.uscourts.gov/sites/default/files/ generalorders/SeventhAmendedGO38.pdf.*

Debtor Mordechai Koka ("Debtor") and plan proponents Dale Gardner and Melissa Gardener (the "Gardners") (collectively, the "Plan Proponents") hereby submit this final brief in support of confirmation of the *Joint Combined Plan of Reorganization and Disclosure Statement (January 24, 2022)* [Dkt. No. 294] (the "Plan") in the above-captioned matter (the "Bankruptcy Case").

This brief is based upon the supporting memorandum of points and authorities set forth below, the prior supporting declarations of Mordechai Koka, Dan Shaw, Richard Dahnken, and Brandon Koka (the "Confirmation Decls.") and all exhibits attached thereto, all other pleadings on file herein, such further testimony and evidence proffered at the final evidentiary hearing, and such other and further arguments and authority as may be presented at the hearing on confirmation.

## I.    Relevant Facts

### A.    Background Facts

As Debtor has previously explained, "[t]his case was commenced with the filing of a petition under Chapter 11 on March 10, 2020" and "[t]he Debtor filed the instant case to stop the non-judicial foreclosure of his real property located at 858 Acalanes Road, Lafayette, CA 94549."

Debtor was the sole shareholder of Green Bay Builders, Inc. ("GBBI"), which operated a business as a general contractor under California Contractors State License Board ("CSLB") License No. 1015144. Debtor utilized the license of another general contractor (as RMO) to conduct business. However, for various reasons, including the COVID-19 global pandemic, in late 2020, Debtor ceased business operations of GBBI and elected to file for protection under the Bankruptcy Code in order to allow for an orderly administration with various creditors.

### B.    Relevant Events in the Bankruptcy Case

On March 10, 2020, Debtor commenced a voluntary petition for relief under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Case"). See Dkt. No. 1.

On August 7, 2020, this Court approved sale of the Vichey Property, which generated net proceeds of sale of approximately $198,502.31. See Dkt. No. 76, 105.

On April 16, 2021, the Gardners filed a creditors' plan of reorganization. See Dkt. No. 114.

On April 20, 2021, and primarily in response to the Gardners' proposed plan of reorganization, Debtor terminated the services of prior counsel, and retained the Fuller Law Firm, P.C. to represent the

estate.  See Dkt. No. 116.  Thereafter, on May 3, 2021, Debtor elected to convert the Bankruptcy Case to a case under Sub-Chapter V.  See Dkt. No. 121.

After contested litigation, the Court determined that Debtor was not eligible to proceed under Sub-Chapter V and converted the Bankruptcy Case back to regular Chapter 11.  See Dkt. No. 179.

Upon conversion back to regular Chapter 11, Debtor and the Gardners determined that it was in the best interest of the estate and all parties in interest to propose a joint plan of reorganization.  To this end, on July 20, 2021, the Plan Proponents filed the first iteration of the joint plan.  See Dkt. No. 193.

After several hearings on approval of the disclosures set forth in the joint plan, along with consideration of a competing plan proposed by the Hannas, the Court ultimately approved those disclosures set forth in the *Joint Combined Plan of Reorganization and Disclosure Statement (January 24, 2022)* (the "Plan").  See Dkt. No. 294.

The Plan Proponents now jointly seek confirmation of the Plan as follows.

### C.    Joint Plan of Reorganization

The Plan provides for four classes of voting creditors, which constitute the only impaired classes in the Plan.  There are no classes of unimpaired claims under the Plan.

The Plan also provides for three groups of unclassified claims:

- Part 3(a)-(b): Administrate Expenses under 11 U.S.C. § 503(b) (if allowed)

- Part 3(c): Priority Tax Claims under 11 U.S.C. §§ 507(a)(8) (if allowed)

- Part 3(d): Priority Security Deposits under 11 U.S.C. §§ 507(a)(7) (if allowed)

Allowed claims for each of these unclassified groups will be paid in full consistent with the terms and conditions of the Plan.

Further, an essential feature of the Plan is appointment of a neutral fiduciary (the Disbursing Agent), whom is tasked with promptly and expeditiously liquidating certain property, making distributions to creditors, and closing the Bankruptcy Case.  Given the unique circumstances of this case, appointment of the Disbursing Agent will allow for prompt resolution, limited litigation (if any), and considerably less administrative fees because the Disbursing Agent will be compensated on an hourly basis and not pursuant to the commission schedule for Trustees set forth in section 326.

///

**D. Required and Available Funding for Plan Payments**

Under the Plan, there are five categories of claims that will be satisfied from various sources.

First, Class 1(A) is the secured claim of HSBC Bank, USA, N.A. with a first priority Deed of Trust secured against the Acalanes Property. On or about June 7, 2022, Debtor sold the Acalanes Property for $1,690,000, and the Class 1(A) claim of HSBC Bank, USA, N.A. ($1,057,229.26) was paid in full through escrow. See Dkt. No. 342.

Second, Class 1(B) is the secured claim of Deutsche Bank, N.A. with a first priority Deed of Trust secured against the Paru Property, and Class 1(C) is the secured claim of Citibank West, FSB secured by a second priority Deed of Trust on the Paru Property.

Under the Plan, Debtor will pay the estimated arrears ($4,662.02) to Deutsche Bank, N.A. thirty (30) days after the Effective Date, and thereafter Debtor will make monthly payments of $5,519.60 to Deutsche Bank, N.A. and $569.99 to Citibank West, FSB. for total monthly payments of $6,089.59.

The source of funds for the pre-petition arrears ($4,662.02) are from available cash reserves, and the source of funds for the post-confirmation obligations ($6,089.59 / month) will be from a combination of rental income, and to the extent necessary, assistance from Debtor's children. Further, to the extent Debtor anticipates he will have insufficient monthly resources to satisfy these plan obligations, given the equity cushion in the Paru Property, Debtor would simply elect to sell the property and pay the entire Class 1(B) and Class 1(C) claims in full.

Third, Class 2 claims of general unsecured claims will be satisfied from three sources: (a) remaining net proceeds of sale (at least $10,000) from the Vichey Property; (b) net proceeds of sale ($530,083.63) from the Acalanes Property; and (c) reside of the estate (if any) after payment of all other claims set forth in the Plan. Given that the Acalanes Property generated sufficient net proceeds of sale to satisfy the requirement for Class 2 claimants (at least $525,000), the Disbursing Agent will not be required to sell the Paru Property.

Fourth, Class 3 is comprised of all administrative claims, which in the Plan are estimated to be in the approximate amount of $94,717, although the exact amount of these claims may be higher given the difficulties in bringing the Plan to confirmation. At present, there are net proceeds of sale from the Vichey Property of $99,732.31 in the IOLTA attorney-client trust account for Debtor's former counsel,

and Debtor's current counsel holds a $30,000 post-petition retainer in its IOLTA attorney-client trust account. The combination of these funds ($129,732.31) along with the available cash balance (approximately $11,205.33) in the DIP account, will be more than sufficient to satisfy all duly allowed administrative claims in full, including the claim of the Disbursing Agent.

Further, to the extent necessary, counsel for Debtor (Lars Fuller) and counsel for the Gardners (Brent D. Meyer) will each voluntarily agree to alternative treatment for their respective administrative claims in order to ensure feasibility on the Effective Date and also to ensure feasibility with respect to payment of all duly allowed administrative claims.

<u>Fifth</u>, although not technically a payment required by the terms of the Plan, Debtor anticipates that the estate will incur capital gains taxes of approximately $167,514 from sale of the Acalanes Property and the Vichey Property, although the precise amount will vary slightly depending on the actual tax basis for the properties taking into account all capital modifications and additions. These taxes will not be due and payable until April 15, 2023 to the Internal Revenue Service (IRS) and Franchise Tax Board (FTB), and Debtor anticipates these taxes will be paid through a combination of rental income, and if necessary, an available equity line in the aggregate amount of $200,000 secured by a third priority Deed of Trust on the Para Property. <u>See</u> Shaw Decl., ¶ 5, Exh. 1.

## II. Objection to Confirmation Filed by Jeff and Amalia Hanna

The only timely objection to confirmation of the Plan (the "<u>Objection</u>") was filed by creditors Jeff and Amalia Hanna (the "<u>Hannas</u>"). <u>See</u> Dkt. No. 302. Although it is difficult to ascertain the exact nature of their argument, it appears that the objection is based on plan feasibility related to Debtor's employment income. This objection is without merit and should be summarily overruled.

As a threshold matter, in an effort to resolve (or limit) the scope of this objection, on September 19, 2022, and pursuant to Bankruptcy Local Rule 3020-1(e), the Plan Proponents initially attempted to meet and confer with the Hannas. Remarkably, despite repeated requests by the Plan Proponents over the past two weeks, as of the date of this brief, the Hannas have refused to answer the following basic questions: (1) In light of comments made by the Court at hearing on September 1, 2022, will the Hannas proceed with prosecuting their objection pursuant to 11 U.S.C. § 1129(a)(11)?; and (2) If so, in order to ascertain the scope of this objection, could the Hannas please advise the Plan

Proponents which portion(s) of the Plan that they believe are not feasible.

As set forth in further detail in Section III.I. below (**11 U.S.C. § 1129(a)(11)**), the Plan is clearly feasible in all material respects required by the Code.

<u>First</u>, as this Court previously explained to the Hannas on multiple occasions, with respect to the general unsecured claim of the Hannas provided for in Class 2 of the Plan, Debtor's monthly income is wholly irrelevant, as the Hannas will receive *pro-rata* distributions from three sources: (a) net proceeds of sale from the Vichey Property (at least $10,000); (b) net proceeds of sale from the Acalanes Property ($530,083.63); and (c) the residue of the estate. <u>See</u> Dkt. 294, Class 2 (pp. 5-6), Part 8. The Hannas <u>will not</u> receive any distributions on account of Debtor's post-confirmation monthly income.

As such, Debtor's post-confirmation monthly income is wholly irrelevant to payment of all Class 2 claims, including the claims of the Hannas.

<u>Second</u>, the only "payments" required under the Plan that will be derived in part from post-confirmation income are payments to secured creditors in Class 1(B) (Deutsche Bank, N.A.) in the monthly amount of $5,519.60 and Class 1(C) (Citibank West, FSB) in the monthly amount of $569.99 for maintenance the Para Property. <u>See</u> Dkt. No. 294, p. 3-4. As such, these are the <u>only</u> 2 creditors that could assert a legitimate objection to the relevancy of Debtor's post-petition monthly income, and there are legitimate concerns regarding the Hannas' standing to raise an objection on their behalf.

Remarkably, however, Deutsche Bank, N.A. holding the largest claim of these classes, actually voted to accept the Plan and does not share the same feasibility concerns expressed by the Hannas.

<u>Third</u>, as set forth in detail in Section III.I. below, the Paru Property currently generates $4,895 in rental income, and if the Plan is confirmed, immediately thereafter Debtor will lease the vacant unit (Unit B) for approximately $3,850 / month. As such, the total revenue generated by the Paru Property ($8,745) will be more than sufficient to satisfy the aggregate payments ($6,089.59) due and owing to Class 1(B) and Claims 1(C) claimants. <u>See</u> Supp. Dahnken Decl. ¶¶ 5-6.

<u>Fourth</u>, as set forth in detail in the supporting declaration of Brandon Koka, Debtor's son has sufficient financial means and has also indicated his willingness to provide monthly assistance to his father in an amount not less than $1,000.00, to the extent necessary to fund any possible shortfall in monthly plan payment.

Fifth, although technically not relevant to resolving the Objection because the Hannas only raised feasibility with respect to plan payments from monthly income, Debtor has already sold the Acalanes Property, which generated net income for Class 2 creditors in the amount of $530,083.63, which is more than sufficient to satisfy the funding requirements for Class 2 claims as set forth in the Plan. See Dkt. 294, pp 5-6; Dkt. No. 342.

Based on the foregoing, the Court should summarily overrule the Objection in its entirety.

### III. Statutory Requirements for Confirmation of the Plan

#### A. 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) requires that "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). "[T]he legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans." Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2nd Cir. 1988). "In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to classification of claims and the contents of a plan of reorganization." In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988). As discussed in detail below, the Plan satisfies the requirements of both sections 1122 and 1123.

##### 1. 11 U.S.C. § 1122

A plan proponent has broad discretion to adopt classification schemes in a plan of reorganization. See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154 (3rd Cir. 1993); Hanson v. First Bank, 828 F.2d 1310, 1313 (8th Cir. 1987); In re Jersey City Medical Ctr., 817 F.2d 1055, 1060-61 (3rd Cir. 1987) (chapter 9 case applying 11 U.S.C. § 1122); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 584-86 (6th Cir. 1986). As the Eleventh Circuit has explained, a "proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case." Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990).

Further, the only restriction in the Bankruptcy Code on the creation of classes is section 1122(a),

which provides that a plan may place a claim or an interest in a particular class only if the claim or interest is "substantially similar" to other claims or interest in the class.  See 11 U.S.C. § 1122(a).  The only other limitation on classification is a prohibition against separately classifying certain claims solely to satisfy the requirement of section 1129(a)(10) that at least one impaired class of claims votes to accept the plan.  See Steelcase, Inc. v. Johnston (In re Johnston), 140 B.R. 526, 529 (B.A.P. 9th Cir. 1992) aff'd 21 F.3d 323 (9th Cir. 1994) (because the "record [did] not establish that the separate classification of [the objector's] claim was proposed to secure the vote of an impaired class of claims," the court upheld the plan's classification scheme); see also U.S. Truck, 800 F.2d at 586.

Here, the classification of claims in the Plan is very simple and not for the purpose of manipulating the outcome of the creditors' votes or for any other inappropriate purpose.  All secured claims are placed in separate classes, all priority claims are placed in two classes, and all general unsecured claims are placed in one class, and all executory contracts and unexpired leases not specifically accepted are rejected under the Plan.  See Dkt. No. 294.

Each of the classes established under the Plan are wholly consistent with the principles that govern section 1122, were established based on claims that are "substantially similar" to other claims within the respective class, and were not established for an improper purpose.

## 2.     11 U.S.C. § 1123(a)

First, section 1123(a)(1) requires that a plan designate classes of claims, other than claims of a kind specified in section 507(a) (administrative expense claims), section 507(a)(2) (involuntary "gap" period claims), section 507(a)(7) (tax claims), and classes of interests.  See In re Haardt, 65 B.R. 697, 700 (Bankr. E.D. Pa. 1986).  Part 3 of the Plan designates classes of claims and of interests in accordance with § 1123(a)(1).  Part 4 describes how all claims are provided for by the Plan, including administrative claims, although such claims are not classified.  As such, the Plan satisfies the requirements of section 1123(a)(1).

Second, section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).

Under section 1124, a class of claims is impaired unless each claim in that class is treated in one of the following ways: (1) the plan leaves unaltered the legal, equitable and contractual rights to which

the holder of such claim is entitled; (2) the plan cures any default, reinstates the maturity, compensates the holder for damages and does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder; or (3) on the effective date of the plan, the holder of such claim receives on account of such claim, cash equal to the allowed amount of the claim. See 11 U.S.C. § 1124.

Here, there are no classes of claims that are not impaired under the Plan.

Third, section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). Whether a claim or interest is "impaired" is determined pursuant to section 1124. See In re Mid Pacific Airlines, Inc., 110 B.R. 489, 491 (Bankr. Haw. 1990). Generally, a class of claims or interests is impaired unless it is treated in accordance with one of the two criteria specified in section 1124.

Here, there are three classes of secured claims (Class 1(A), 1(B), and 1(C)) that are impaired under the Plan, and one class of unsecured claims (Class 2) that is impaired under the Plan, and the treatment for these claims are specified in the section corresponding to identification to such claim.

Fourth, section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." See In re Monroe Well Service, Inc., 80 B.R. 324, 336 (Bankr. E.D. Pa. 1987) (equality of treatment provision of § 1123(a)(4) only applies to claims placed in the same class). The Plan provides the same treatment for each claim contained in each of the classes under the Plan in compliance with section 1123(a)(4).

Fifth, section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth several examples of such adequate means. See In re Stuart Glass & Mirror, Inc., 71 B.R. 332, 334 (Bankr. S.D. Fla. 1987) (plan must provide adequate means for its execution). In accordance with section 1123(a)(5), means for implementing the Plan are set forth in Section 8 of the Plan, Exhibits 2-5 of the Plan, and the various means contained elsewhere in the Plan are adequate to enable the Disbursing Agent (and Reorganized Debtor) to implement the Plan in compliance with section 1123(a)(5). See Confirmation Decls.

Part 1, Part 2, and Part 8 of the Plan also provides that the Plan shall be funded from cash on hand, net proceeds of sale from the Vichey Property, the Acalanes Property, and the Paru Property (if

necessary).  Further, cash on hand is sufficient to fund all payments due on the Effective Date of the Plan and the balance of the cash on hand is ample to provide sufficient funds to enable the Disbursing Agent to operate for the term of the Plan.  <u>See</u> Confirmation Decls.

Based on the means for implementation of the Plan described above and elsewhere in the Plan, the Plan provides adequate means for its implementation in satisfaction of section 1123(a)(5).

### 3.    11 U.S.C. § 1123(b)

<u>First</u>, section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  As discussed above, all claims (secured and unsecured) provided for in the Plan are impaired.

<u>Second</u>, sections 365 and 1123(b)(2) permits a plan to provide for the assumption or rejection of any executory contract and unexpired lease not previously rejected.  <u>See</u> 11 U.S.C. § 1123(b)(2).  Further, Federal Rule of Bankruptcy Rule 6006(a) provides that the assumption or rejection or an executory contract or unexpired lease as a part of a plan is not governed by Bankruptcy Rule 9014.  As such, there is no requirements for a separate motion, notice, or hearing.

Part 4(a) of the Plan provides the specific executory contracts and unexpired leases that are assumed, and all other executory contracts and unexpired leases shall be rejected, although Debtor is unaware of any executory contract or unexpired lease that is not specifically identified in Part 4(a) and therefore rejected under the Plan.

<u>Third</u>, section 1123(b)(3)(B) provides that a plan may provide for "the retention and enforcement by the Debtor… of any… claim…".  11 U.S.C. § 1123(b)(3)(B).  Here, the Disbursing Agent retains all claims and causes of action, although there are not relevant claims held by Debtor that are anticipated to be asserted.  <u>See</u> Plan, Part 6(f).

Based on the foregoing, the Plan complies with both the classification provisions of section 1122 and the mandatory and permissive contents provisions of section 1123.  As such, the Plan satisfies the requirements of section 1129(a)(1).

### B.    11 U.S.C. § 1129(a)(2)

Section 1129(a)(2) requires that the proponent of the plan comply with "the applicable provisions" of title 11.  <u>See</u> 11 U.S.C. § 1129(a)(2).  In this context, the "applicable provisions" of title

11 are section 1121 (who may file a plan), section 1125 (solicitation of acceptances of a plan), and section 1127 (modification of a plan).  See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Sections 1121(a) and (c) permit a Debtor to file a plan of reorganization, and section 1121(c) allows for a creditor to file a plan of reorganization under certain circumstances.  See 11 U.S.C. § 1121. Here, the Plan has been jointly proposed by Debtor and the Gardners.

One of the principal purposes of section 1129(a)(2) is to ensure that proponents have complied with the requirements of section 1125 in the solicitation of acceptances of a plan of reorganization.  See In re Jeppson, 66 B.R. 269, 296 97 (Bankr. Utah 1986); In re Toy & Sports Warehouse, Inc., 37 B.R. at 149 ("the Proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with §§ 1125 and 1126.").  Here, neither Debtor nor the Gardners ever sought solicitation of acceptance of the Plan until after such time that this Court approved the disclosure statement set forth in the Plan.

C.    11 U.S.C. § 1129(a)(3)

Section 1129(a)(3) requires that the plan has been "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).

Although the term "good faith" is left undefined by the Bankruptcy Code, "[i]n the context of a chapter 11 reorganization . . . a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Hanson v. First Bank of South Dakota, 828 F.2d 1310, 1315 (8th Cir. 1987) (quoting In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)) ("[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code"); see also In re Corey, 892 F.2d 829, 835 (9th Cir. 1989); In re Stolrow's Inc, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) ("[g]ood faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code.") Further, courts have generally held that the "good faith" requirement should be considered in light of the totality of circumstances.  See In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) ("[t]he requisite good faith determination is based on the totality of the circumstances").

Here, the Bankruptcy Case was filed initially to stop the imminent non-judicial foreclosure sale

on the Acalanes Property and preserve the equity in the property for the benefit of the estate. Thereafter, as this Court is well aware, there was significant contested litigation related to many issues, but ultimately, Debtor and the largest general unsecured creditor (the Gardners) collectively determined that is was in the best interest of all creditors and the estate to work cooperatively on a joint plan of reorganization with three principles in mind.

First, the Plan Proponents wanted to establish a streamlined process for administration of the post-conformation estate, which would allow for prompt liquidation of certain property of the estate and prompt payment of a *pro-rata* distribution to general unsecured creditors.

Second, the Plan Proponents wanted to appoint a neutral third-party (the Disbursing Agent) to promptly and effectively administer the post-confirmation estate and eliminate all issues with holding funds in trust and making distributions to claimants as required by the Plan.

Third, the Plan Proponents wanted to provide a dividend to general unsecured creditors which was significantly larger than under a Chapter 7 liquidation, which was accomplished by Debtor voluntarily agreeing to a larger payment to Class 2 claimants, waiver of Debtor's homestead exemption, Debtor to pay for all applicable capital gains taxes, and appointment of the Disbursing Agent who would be compensated on an hourly basis and not pursuant to the commission schedule set forth in section 326 for Chapter 7 and Chapter 11 trustees.

With these three principles in mind, along with all other protective mechanisms in the Plan to ensure effective and prompt administration, the Plan was clearly proposed in good faith and not by any means forbidden by applicable law. This conclusion is bolstered by the fact that Debtor and the largest unsecured creditor (the Gardners) jointly proposed the Plan, which was universally accepted by all creditors that affirmatively voted on the Plan.

Further, no creditor has filed an allowed objection raising section 1129(a)(3), and pursuant to Federal Rule of Bankruptcy Procedure 3020(b)(2), "[i]f no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law *without receiving evidence on such issues*." Fed. R. Bankr. P. 3020(b)(2) (emphasis added).

As such, the Plan complies with the requirements of section 1129(a)(3).

///

### D.    11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) provides "[a]ny payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4). Section 1129(a)(4) is directed primarily at policing the award and payment of professional fees from the estates in Chapter 11 cases.  See 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 2015) ("[s]ection 1129(a)(4) requires that the bankruptcy court exercise substantive control over fees and costs related to confirmation and the chapter 11 case").

Here, Part 3 of the Plan provides for payment of all administrative claims on the Effective Date or upon approval by this Court, whichever is later.  See In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("[c]ourt approval of payments for services and expenses is governed by various Code provisions e.g., §§ 328, 329, 330, 331, and 503(b) and need not be explicitly provided for in a Chapter 11 plan"); In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where plan provided for payment of only "allowed" administrative expenses).

### E.    11 U.S.C. § 1129(a)(7)

Section 1129(a)(7) sets forth the "best interest of creditors" test, which in relevant party requires that "each holder of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7).

Under the Plan, there are 4 classes of impaired claims (Class 1(A), Class 1(B), Class 1(C), and Class 2), and each class that actually voted (Class 1(A), Class 1(B), and Class 2), all accepted the Plan. The only class that did not affirmatively accept the Plan was Class 1(C) (Citibank West, FSB), which has not participated the Bankruptcy Case and not surprisingly did not cast a vote.

Further, as of the date of this brief, distribution to general unsecured claims will be at least $544,273.94 (34.73%) under the Plan, whereas the anticipated liquidation amount under a hypothetical

Chapter 7 is approximately $254,472.71 (16.28%).  See Dkt. No. 294, Exh. B.  As this Court is well aware, there is a pending objection to Debtor's asserted homestead exemption in the Acalanes Property, and even if this amount ($75,000) was included in the liquidation amount, general unsecured creditors would only receive approximately $329,472.71 ($254,472.71 + $75,000) (21.02%), which is considerably less than proposed amount under the Plan.

As such, three out of four impaired classes have affirmatively and unanimously accepted the Plan, and general unsecured creditors will receive a dividend payment of approximately $289,801.23 (19.06%) more under the Plan compared with the dividend in a hypothetical Chapter 7 liquidation. Further, since the Disbursing Agent will be making these distributions, payments to general unsecured creditors will happen much more expeditiously than if the estate were liquidated by a Chapter 7 trustee.

### F.    11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) requires that each class of claims and interests either has accepted the Plan or is not impaired under the Plan.  See 11 U.S.C. § 1129(a)(8).  Here, as set forth above, Class 1(A), Class 1(B), and Class 2 are the only classes that actually voted, and each of these classes affirmatively and unanimously accepted the Plan.  However, Class 1(C) did not vote on the Plan, and as such, is deemed not to affirmatively accept the Plan, and as such, the Plan Proponents must satisfy the requirement of section 1129(b) to confirm the Plan.

Section 1129(b)(1) provides that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

Further, pursuant to section 1129(b)(2)(A)(i), with respect to secured claims that have not accepted the Plan, the Plan must provide: (i) the creditor must retain its lien to the extent of its allowed claim; and (ii) the creditor must receive deferred cash payments totaling the allowed amount of its claim, of a value, as of the effective date of the plan.  See 11 U.S.C. § 1129(b)(2)(A)(i).

Here, the only class that did not affirmatively vote to accept the Plan was Class 1(C), which is the secured claim of Citibank West, FSB secured by a second priority Deed of Trust on the Paru

Property. In the Plan, this Class 1(C) will: (i) retain its lien on the Paru Property; (ii) have an allowed claim in the full amount of the outstanding principal and interest due and owing (estimated at $153,000); (iii) interest will accrue at 3.25% *per annum*;[2] and (iv) Debtor will make monthly payments of $569.99 in 480 equal monthly payments in full satisfaction of the claim. See Dkt. No. 294, p. 4.

Given the sizeable equity cushion in the Paru Property with respect to the Class 1(C) claim of Citibank West, FSB, given that Debtor will have cured all outstanding arrears (approximately $4,662.02) to the holder of the senior lien (Class 1(B) claimant) and will be contractually current with this obligation shortly after the Effective Date, given the limited risk (if any) to Citibank West, FSB with respect to its secured claim, and given that the proposed interest rate is compliant with the risk analysis in Till v. SCS Credit Corp., 541 U.S. 465 (2004), the Plan Proponents submit that treatment of the Class 1(C) claim of Citibank West, FSB is compliant with the requirements of section 1129(b)(2)(A)(i).

As such, notwithstanding that Class 1(C) did not vote and is deemed to reject the Plan, pursuant to section 1129(a)(1), this Court has authority to find that the proposed treatment of the Class 1(C) claim is fair and equitable and satisfies the requirements of section 1129(b)(2)(A)(i).

### G. 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) contains provisions generally requiring immediate payment in cash of administrative and non-tax priority claims and permitting the deferred payment of priority tax claims over a period not exceeding five years. See 11 U.S.C. § 1129(a)(9).

Here, the Plan provides for payment in full in cash of each allowed administrative claims upon allowance by the Court or the Effective Date, which satisfies the requirements of section 1129(a)(9)(A). See Docket No. 294, Part 3(a)-(b). Further Part 3(c) of the Plan also provides for payment of all other priority tax claims (if any) over a period not exceeding five years and Part 3(d) provides for payment of priority security deposit claims upon surrender of the premises by the tenants. Id., at Part 3(c)-(d). As such, the Plan satisfies all of the requirements of section 1129(a)(9).

---

[2] This was the prime rate of interest as of the date the Plan (January 24, 2022) was originally filed, and since the prime rate of interest has subsequently increased (currently at 6.25%), although no party in interest has objected, the Plan Proponents will stipulate in the Order Confirming Plan to increase the interest rate to the current prime rate of interest (6.25%), or such other rate determined by the Court, that is necessary to satisfy the requirements of section 1129(b)(2)(A)(i).

**H.    11 U.S.C. § 1129(a)(10)**

Section 1129(a)(10) requires that at least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim in such class. See 11 U.S.C. § 1129(a)(10); see also In re Toy & Sports Warehouse, Inc., 37 B.R. at 151.

As set forth above, Class 1(A), Class 1(B), and Class 2 have *unanimously* and affirmatively voted to accept the Plan, which satisfies the requirements of section 1129(a)(10).

**I.    11 U.S.C. § 1129(a)(11)**

Section 1129(a)(11) sets forth the feasibility requirements, which provides that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

"To satisfy this section, known as the 'feasibility requirement,' the debtor must demonstrate that the plan '*has a reasonable probability of success*.'" First Southern Nat'l Bank v. Sunnyslope Hous. Ltd. P'ship (In re Sunnyslope Hous. Ltd. P'ship), 859 F.3d 637, 646-47 (9th Cir. 2017) (*en banc*) (*quoting* In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986)) (emphasis added); see also In re Hamilton, 803 F. App'x 123, 125 (9th Cir. 2020). Further, "[a] bankruptcy court's finding of feasibility is reviewed for abuse of discretion." Id. at 647.

However, while a reviewing court "must examine 'the totality of the circumstances' in order to determine whether the plan fulfills the requirements of § 1129(a)(11)," S & P, Inc. v. Pfeifer, 189 B.R. 173, 183 (N.D. Ind. 1995) (*quoting* In re Mulberry Phosphates, Inc., 149 B.R. 702, 708 (Bankr. M.D. Fla. 1993)), only "*a relatively low threshold of proof [is] necessary to satisfy the feasibility requirement*." In re Sea Garden Motel and Apartments, 195 B.R. 294, 305 (D. N.J. 1996) (emphasis added). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan of reorganization can be performed. See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

Finally, "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985)

(*citing* 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at 1129-34 (15th ed. 1984)).

### 1. Plan Feasibility for Effective Date Payment

Contemporaneous with the Effective Date of the Plan (15th day following the date of the entry of the order of confirmation), there are certain payments required by the Plan, each of which are summarized in detail below:

| Date | Amount | Balance | Notes |
|---|---|---|---|
| 06/10/2021 | $ 99,732.31 | $ 99,732.31 | Net Proceeds of Sale for Vichey Property (Held by Farsad Law P.C.) (See Dkt. No. 105) |
| 06/10/2021 | $ 30,000.00 | $ 129,732.31 | Post-Petition Retainer (Held by The Fuller Law Firm P.C.) (See Dkt. No. 134) |
| 07/31/2022 | $ 11,205.33 | $ 140,937.64 | Balance in DIP Account on July 31, 2022 (See Dkt. No. 362) |
| **Sale of Acalanes Property** | | | |
| 06/07/2022 | $ 530,083.63 | $ 671,021.27 | Net Proceeds of Sale for Acalanes Property (Held by the Debtor's Counsel) (See Dkt. No. 342) |
| **Effective Date Payments** | | | |
| 10/28/2022 | $ (9,717.00) | $ 661,304.27 | Class 3(a) Administrative Claim of Christopher Hayes (Former Sub-Chapter V Trustee) (See Dkt. No. 203) |
| 10/28/2022 | $ (10,000.00) | $ 651,304.27 | Class 2 General Unsecured Claims (Initial Payment) (See Dkt. No. 294, p. 5) |
| **30 Days\* After Close of Escrow for Acalanes Property** | | | |
| 10/28/2022 | $ (530,083.63) | $ 121,220.64 | Estimated Payment to Class 2 Claimants from Net Proceeds of Acalanes Property (See Dkt. No. 294, p. 5) |
| **30 Days After Effective Date** | | | |
| 11/12/2022 | $ (4,662.02) | $ 116,558.62 | Class 1(B) Arrearage Payment to Deutsche Bank, N.A. (See Dkt. No. 294, p. 3) |
| **Outstanding Administrative Claims** | | | |
| 11/30/2022 | $ (45,000.00) | $ 71,558.62 | Estimated Class 3(a) Administrative Claim for The Fuller Law Firm P.C. (See Dkt. No. 294, p. 7) |
| 11/30/2022 | $ (5,000.00) | $ 66,558.62 | Estimated Class 3(a) Administrative Claim for Farsad Law P.C. (See Dkt. No. 294, p. 7) |
| 11/30/2022 | $ (35,000.00) | $ 31,558.62 | Estimated Class 3(b) Administrative Claim for Meyer Law Group, LLP (See Dkt. No. 294, p. 7) |
| **United States Trustee's Fees** | | | |
| 10/21/2022 | $ (25,378.51) | $ 6,180.11 | Estimated U.S. Trustee's Fees for Q3 2022 Distributions |
| 01/21/2023 | $ (250.00) | $ 5,930.11 | Estimated U.S. Trustee's Fees for Q4 2022 Distributions |
| **Fees and Costs of Disbursing Agent** | | | |
| 12/31/2022 | $ (5,000.00) | $ 930.11 | Estimated Post-Confirmation Fees of Disbursing Agent (See Dkt. No. 294, pp. 17-18) |
| | | $ 930.11[3] | **ESTIMATED RESIDUE OF THE ESTATE** |

---

[3] Given the very small residue of the estate, as set forth above, and in order to ensure feasibility for both payments due on the Effective Date and for all other payments due under the Plan, counsel for Debtor (Lars Fuller) and counsel for the Gardners (Brent D. Meyer) will make appropriate arrangements for payment of their respective administrative claims, and Debtor will also have access to a $200,000 line of credit secured by the Paru Property to make up for any potential shortfall.

<u>First</u>, the Court previously approved the sale of the Acalanes Property pursuant to section 363(b), which generated net proceeds of $530,083.63 (<u>see</u> Dkt. No. 342) for the benefit of Class 2 claimants, and these proceeds are greater than the minimum amount ($525,000) required by the terms of the Plan. <u>See</u> Dkt. No. 294, p. 5. As such, it is not anticipated that the Disbursing Agent will be required to liquidate the Paru Property to satisfy the minimum payment requirement for Class 2 claimants. <u>Id.</u>

<u>Second</u>, as set forth in detail in the chart above, and based on realistic estimates for the administrative claims of all professionals and the anticipated fees due to the Office of the U.S. Trustee, it is anticipated that the residue of the estate will be approximately $930.11. As such, it is anticipated that the Disbursing Agent will have more than sufficient funds to make <u>*all*</u> distributions required by the terms and conditions of the Plan.

Based on the foregoing, there exists a reasonable probability that the provisions of the plan of reorganization can be performed with respect to payments due and owing contemporaneous with the Effective Date of the Plan.

### 2. Plan Feasibility for Monthly Plan Payments to Secured Claimants

In the Plan, there are only two reoccurring monthly payments that will be made after the Effective Date, which are: (1) $5,519.60 to Class 1(B) claimant Deutsche Bank, N.A.; and (2) $569.99 to Class 1(C) claimant Citibank West FSB. <u>See</u> Dkt. No. 294, pp. 3-4. Both of these payments are to secured creditors on account of their respective deeds of trust encumbering the Paru Property. <u>Id.</u>

Previously, the Court and the Hannas raised concerns regarding the amount and duration of monthly employment income generated by Debtor throughout this Bankruptcy Case. However, even without consideration of employment income, Debtor will have sufficient monthly income to satisfy all monthly obligations required by the Plan and all personal living expenses.

As previously disclosed, after close of escrow for the Acalanes Property, Debtor relocated to Israel to live with and care for his ailing mother. As such, Debtor does not have any daily living or shelter expenses, as these are paid exclusively by the Israeli government or by his mother, and to the extent the Plan is confirmed, Debtor anticipates leasing the vacant unit in the Paru Property (Unit B), which is the largest unit in the property, and conservative estimates for monthly rental income is $3,850 for the unit. <u>See</u> Supp. Dahnken Decl. ¶¶ 5-6.

Based on these circumstances, Debtor anticipates regular monthly income without reference to any monthly employment income as follows:

| Source | Amount | Notes |
|---|---|---|
| **Monthly Income (Non-Employment)** | | |
| Rental Income (Unit A) | $ 3,000.00 | Current Rental Income for Paru Property, Unit A (See Dkt. No. 301) |
| Rental Income (Unit C) | $ 1,895.00 | Current Rental Income for Paru Property, Unit C (See Dkt. No. 301) |
| Rental Income (Unit B) | $ 3,850.00 | Anticipated Rental Income for Paru Property, Unit B (See Supp. Dahnken Decl. ¶¶ 5-6) |
| Contribution from Son | $ 1,000.00 | Monthly Contributions from Debtor's Son (See Dkt. No. 309) |
| **TOTAL** | **$ 9,745.00** | |

In order to satisfy all monthly obligations, Debtor is required to make post-confirmation payments pursuant to the terms and conditions of the Plan as follows:

| **Monthly Expenses (Paru Property)** | | |
|---|---|---|
| Class 1(B) Mortgage Payment | $ (5,519.60) | See Dkt. No. 294, p. 3 |
| Class 1(C) Mortgage Payment | $ (569.99) | See Dkt. No. 294, p. 4 |
| Rental Expenses and Maintenance | $ (1,000.00) | See Dkt. No. 294, p. 25 |
| **TOTAL** | **$ (7,089.59)** | |

Finally, while living in Israel, Debtor will not have any reoccurring monthly expenses, but will maintain insurance coverage for his vehicles that are located in the United States ($315.04 / month) and will conservatively budget approximately $443.96 / month for cell phone service and other monthly expenses for meals and entertainment.

Based on the foregoing, Debtor anticipates monthly income of approximately $9,745, monthly obligations for plan payments and rental expenses for the Paru Property of $7,089.59, and monthly personal expenses of approximately $759, which will generate net disposable income of approximately $1,896.41 on a monthly basis. As such, the monthly rental income from the Paru Property alone will be more than sufficient to satisfy all plan obligations on a monthly basis, without the necessity of employment income, and the monthly contributions ($1,000) from Debtor's son (Brandon Koka), although such contribution will provide a buffer to ensure timely payment of all monthly expenses.

Finally, although not necessary to satisfy the requirements of section 1129(a)(11), there are several additional points that the Plan Proponents wish to address regarding feasibility of the Plan, as

they could be relevant to the Objection asserted by the Hannas.

First, as set forth in detail in Section III.I.3. below, the Paru Property will automatically revest in the reorganized Debtor immediately upon sale of the Acalanes Property in which the net proceeds of sale available to Class 2 claimants exceeds $525,000. See Dkt. No. 294, p. 16. As such, to the extent that Debtor encounters a situation in which he anticipates that monthly income may not be sufficient to pay all required monthly plan payments, then Debtor would elect to sell the Paru Property, which would satisfy the entire debt due and owing to Class 1(B) and Class 1(C) claimants and negate the need for monthly employment income. See Dkt. No. 294, Exh. 2; Dkt. No. 307, ¶ 20.

Second, as drafted, the Plan unequivocally does not provide that Class 2 claimants (including the Hannas) will receive _any_ amounts on account of disposable income generated by Debtor on a monthly basis. See Dkt. No. 294, pp. 5-6. Rather, payment to Class 2 claimants is limited _solely_ to net proceeds of sale from the Vichey Property, Acalanes Property, and Paru Property (if necessary). Id.

As such, except for animus towards Debtor, it is perplexing that the Hannas would object to confirmation of the Plan (but not vote to reject the Plan) based on feasibility of monthly plan payments. Further, in the unlikely event that Debtor defaults on monthly plan payments, such a default would be irrelevant and immaterial as to the Hannas because the Plan specifically prohibits Class 2 claimants from invoking default remedies for failure to satisfy plan obligations to Class 1(B) or Class 1(C) claimants. See Dkt. No. 294, p. 10 ("obligations under the Plan are separate with respect to each class of creditors … [d]efault in performance of an obligation due to members of one class _shall not by itself constitute a default with respect to members of other classes_") (emphasis added).

Third, as set forth in Section III.K. below, notwithstanding the Hannas' flawed understanding of section 1129(a)(15), since the Plan clearly provides for aggregate payments ($1,869,543.89) to all creditors well in excess of the Debtor's "projected disposable income" ($3,349.24) for 60 months (without any adjustments for Lanning), Debtor is not required to pay any "disposable income" to general creditors on a monthly basis pursuant to section 1129(a)(15) or any other provision of the code.

Fourth, as is typical with a vast majority of reorganization cases for individual debtors (such as Chapter 13 cases), courts routinely adopt a "proof is in the pudding" approach to the feasibility analysis for monthly plan payments, at least in instances where financial projections demonstrate a reasonable

probability that debtor can satisfy the monthly obligations.

Here, this approach appears to be in the best interest of all parties and the estate (and consistent with the requirements of section 1129(a)(11)), because since the Petition Date (March 10, 2020), and over the prior 2 years, Debtor has demonstrated a consistent ability to make on-going payments due and owing to Class 1(B) claimant (Deutsche Bank, N.A.) (see *Monthly Operating Reports*), because monthly plan payments to Class 1(B) and Class 1(C) claimants have absolutely no relevance (or bearing) on payments to Class 2 claimants (including the Hannas) under the Plan, because Class 1(B) claimant (Deutsche Bank, N.A.) has affirmatively voted to accept the Plan and clearly does not share the same feasibility concerns asserted by the Hannas (see Dkt. No. 304), because, as set forth above, Debtor has provided reasonable projections demonstrating a reasonable probability that he will have sufficient income to satisfy all monthly plan payments provided for in the Plan, and because there is a significant equity cushion (approximately $672,456) in the Paru Property to adequately protect the security interests of Class 1(B) and Class 1(C) claimants in the extremely unlikely event of a default and subsequent non-judicial foreclosure sale (see Dkt. No. 294, Exh. 2, p. 23).

Based on the foregoing, there exists a reasonable probability that the provisions of the plan of reorganization can be performed with respect to monthly payments due and owing to Class 1(B) and Class 1(C) secured creditors.

### 3. Plan Feasibility for Post-Confirmation Capital Gains Taxes

In the Plan, there are no required payments by the Disbursing Agent for post-petition capital gains taxes due and owing to the Internal Revenue Service and the Franchise Tax Board from the sale of property of the Post-Confirmation Estate. Rather, Exhibit 6, Paragraph B provides that "Debtor shall be solely responsible for any and all post-petition tax obligations, including but not limited to, capital gains taxes due and owing to the Internal Revenue Service (IRS) and California Franchise Tax Board (FTB) resultant from the sale of any real property and personal property after the petition date (March 10, 2020)." See Dkt. No. 294, p. 28.

Assuming *argumentum* that capital gains taxes due and owing from sale of the Acalanes Property are construed as "plan payments" for purposes of section 1129(a)(11), which would not be due and payable to the applicable taxing authorities until April 15, 2023, Debtor anticipates making payments for

these taxes from one of the following sources.

First, as set forth in the Declaration of Mordechai Koka filed in support of confirmation, Debtor anticipates capital gains taxes due and owing to the IRS and FTB in the aggregate amount of $167,514. See Dkt. No. 310, ¶¶ 21-23. Assuming that the Acalanes Property generates net proceeds of sale of $525,000 for payment of Class 2 claimants as set forth in Section I.B above, then Section 8(e)(i) of the Plan provides that "upon close of escrow for the sale of the property, all remaining property of the Post-Confirmation Estate, including real property located at *1702 Paru Street, Alameda, California 94501, shall immediately and automatically revest in Debtor consistent with Part 5(b) of the Plan*, and shall no longer constitute property of the estate subject to administration and control of the Disbursing Agent." See Dkt. No. 294, p. 16 (emphasis added).

The Paru Property would revest in the reorganized Debtor pursuant to section 1141(b) on or about October 28, 2022, and would no longer constitute property of the Post-Confirmation Estate subject to administration by the Disbursing Agent. Id. As such, Debtor would utilize the equity in the Paru Property to obtain a third priority deed of trust encumbering the Paru Property in the aggregate amount not exceeding $200,000, in order to timely and promptly make all payments due and owing to the IRS and FTB for applicable capital gains taxes. See Dkt. No. 308, Exh. 1.

Second, and alternatively, in order to satisfy the estimated capital gains taxes ($167,514) due and owing to the IRS and FTB, Debtor could elect to sell the Paru Property, and as set forth in Exhibit 2 to the Plan, the estimated net proceeds of sale for the Paru Property ($188,329) are more than sufficient to satisfy the estimated capital gain taxes ($167,514). See Dkt. No. 294, p. 23.

Based on the foregoing, there exists a reasonable probability that the provisions of the plan of reorganization can be performed with respect to payments due and owing to the IRS and FTB on account of post-petition capital gains taxes.

### 4. The Plan Satisfies All Feasibility Requirements of 11 U.S.C. § 1129(a)(11)

As the Ninth Circuit has recognized, "[t]he purpose of section 1129(a)(11) is to prevent confirmation of *visionary schemes* which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." Matter of Pizza of Hawaii, Inc., 761 F.2d at 1382 (citations omitted) (emphasis added).

Here, the Plan does not provide "visionary schemes" that promise creditors more under a plan than Debtor can provide after confirmation of the Plan. Rather, as set forth in detail in Sections III.I.A-III.I.C. above, all claimants (including Class 2 claimants) will receive *exactly* what they are promised under the Plan, and the Plan Proponents have provided ample evidence to support feasibility of the Plan consistent with the requirements of section 1129(a)(11). See In re Mulberry Phosphates, Inc., 149 B.R. at 708 ("a relatively low threshold of proof [is] necessary to satisfy the feasibility requirement").

Simply stated, the Plan is not a "visionary scheme," but rather a unique collaboration between Debtor and the largest creditor of the estate (the Gardners) to provide significant and meaningful distributions to general unsecured creditors (Class 2 claimants), in relatively short order, and without the unnecessary and burdensome administrative expenses of a Chapter 7 liquidation.

Finally, and rather significantly, all creditors that voted on the Plan *unanimously* accepted the Plan and concur that the Plan (as drafted) is feasible, not a "visionary scheme," and is in the best interest of all creditors and the estate. Under these circumstances, and for the reasons set forth above, the Court should afford significant deference to the wishes and desires of all creditors that voluntarily *elected* to exercise their voting rights under section 1126(a) and accept the Plan.

Based on the foregoing, the Plan likely will not be followed by liquidation or further need for reorganization. As such, the Plan is feasible and satisfies the requirements of section 1129(a)(11).

### J.  11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930 (consisting primarily of the quarterly fee to the United States Trustee) be paid on the effective date of the plan. See 11 U.S.C. § 1129(a)(12). Here, Debtor is current with all quarterly payments to the Office of the U.S. Trustee, as set forth in Exhibit 4 of the Plan, Debtor will have sufficient resources to make the quarterly payment due shortly after the Effective Date, and will have sufficient cash reserves to make subsequent payments prior to entry of the discharge and closure of the Bankruptcy Case.

### K.  11 U.S.C. § 1129(a)(15)

Section 1129(a)(15) provides that "[i]n a case in which the *debtor is an individual* and in which the holder of an *allowed unsecured claim objects to the confirmation* of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan

on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15) (emphasis added).

The Plan Proponents have performed significant legal research and cannot locate any opinion (published or unpublished) that specifically addresses the legal question of what triggers application of section 1129(a)(15) — a specific objection to section 1129(a)(15) or simply any other objection to confirmation filed by a general unsecured creditor. Further, as the Court previously addressed, there are several opinions in which section 1129(a)(15) was triggered when a general unsecured creditor objected to confirmation on other grounds. See In re Villalobos, 2014 WL 930495, at *13 (B.A.P. 9th Cir. 2014); see also In re Stigliano, 483 B.R. 303, 305 (Bankr. W.D. Pa. 2012) (noting the ambiguity of section 1129(a)(15) and that the legislative history "does not shed light on the proper construction").

As such, given the fairly unambiguous text of the statute and the lack of authority stating otherwise, it appears that section 1129(a)(15) may be triggered simply by the filing of an objection to confirmation by a general unsecured creditor on any ground.

Assuming *argumentum* that section 1129(a)(15) is applicable based on the filing of the Timely Objection to Confirmation [Dkt. No. 302] by the Hannas, as set forth in detail below, the Plan Proponents undoubtedly satisfy the requirements of section 1129(a)(15)(B).

There is Ninth Circuit *dicta* suggesting that section 1129(a)(15)(B) requires debtors to "dedicate at least five years' disposable income to the payment of unsecured creditors[.]" See Zachary v. California Bank & Tr., 811 F.3d 1191, 1199 (9th Cir. 2016) (*quoting* Ice House Am., LLC v. Cardin, 751 F.3d 734, 740 (6th Cir. 2014)). However, the United States Supreme Court has made clear that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1992).

As such, a plain reading of section 1129(a)(15)(B) only requires that the "value of the property" to be distributed "under the plan" be not less than the "projected disposable income" that is to be received by the debtors during the 5-year period beginning on the date plan payments begin, or during the term of the

plan, whichever is longer.  See 11 U.S.C. § 1129(a)(15)(B) (emphasis added).

"In other words, a plain language reading of section 1129(a)(15)(B): (1) does not require that debtors contribute all of their projected disposable income to the plan, but rather requires that the total 'value of the property' to be distributed be at least equal to the debtor's projected disposable income; and (2) requires that courts compare the debtor's projected disposable income to the value of all property that is to be distributed 'under the plan,' not just the value of the property to be distributed to general unsecured creditors."  In re Crowe, 2021 WL 2212005, at *10 (Bankr. D. Ariz. 2021).

Had Congress intended that section 1129(a)(15)(B) require debtors to contribute the value of their projected disposable income to the payment of unsecured creditors, Congress could have so provided. Section 1129(a)(15)(B) refers explicitly to and incorporates by reference a portion of section 1325(b)(2). Section 1325(b)(2)'s counterpart, section 1325(b)(1), specifically provides that in chapter 13 cases in which the provision applies, the plan must "provide[ ] that all of the debtor's *projected disposable income* to be received *in the applicable commitment period* beginning on the date that the first payment is due under the plan *will be applied* to make payments *to unsecured creditors under the plan*."  11 U.S.C. § 1325(b)(1)(B) (emphasis added).

Section 1129(a)(15)(B), by contrast, requires only that "*the value of the property* to be distributed *under the plan*" be not less than the *projected disposable income* received by the debtor during the *applicable time period*.  11 U.S.C. § 1129(b)(2)(B) (emphasis added).  Congress clearly knew how to require a debtor to commit his or her projected disposable monthly income to the payment of unsecured creditors for an applicable commitment period, and Congress opted not to impose such requirement in individual chapter 11 cases.  See In re Crowe, 2021 WL 2212005, at *10-11.

Here, in order to determine compliance with section 1129(a)(15)(B), as a threshold matter, there are several calculations that must be performed.

### 1.      Calculation of "Current Monthly Income"

Section 101(10A) provides that "current monthly income" is defined as "the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—(i) the last day of the calendar month immediately preceding the date of the commencement

of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and … includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent). 11 U.S.C. § 101(10A).

Further, pursuant to section 101(10A), there are 5 enumerated categories of income which are specifically excluded from the definition of "current monthly income," including income earned under the Social Security Act, such as benefits for unemployment compensation. Id.

Here, at the hearing on October 13, 2022, Debtor will offer testimony and introduce evidence (pre-petition bank statements) establishing the following "current monthly income" received during the six-month period preceding the Petition Date:

| Calculation of Current Monthly Income | | |
|---|---|---|
| September 2019 | $ 9,145.00 | Aggregate Deposits and Transfers from GBBI |
| October 2019 | $ 7,645.00 | Aggregate Deposits and Transfers from GBBI |
| November 2019 | $ 10,245.00 | Aggregate Deposits and Transfers from GBBI |
| December 2019 | $ 13,457.00 | Aggregate Deposits and Transfers from GBBI |
| January 2020 | $ 7245.00 | Aggregate Deposits and Transfers from GBBI |
| February 2020 | $ 19,445.00 | Aggregate Deposits and Transfers from GBBI |
| **TOTAL** | **$ 61,7187.00** | |
| **CURRRENT MONTHLY INCOME** | **$ 11,197.83** | |

As such, and as the starting point for the calculation of disposable income, Debtor's "current monthly income" for purposes of section 101(10A) is $11,197.83.

**2.      Calculation of Reasonable and Necessary Expenses**

As this Court previously recognized, "in calculating an individual Chapter 11 debtor's projected disposable income, § 1129(a)(15)(B) must be read to allow a judicial determination of the expenses that are reasonably necessary for the support of the debtor and his or her dependents." In re Roedemeier, 374 B.R. 264, 273 (Bankr. D. Kan. 2007); see also In re Hamilton-Gaertner, No. 17-00271-5-DMW, 2019 WL 2366421, at *9 (Bankr. E.D.N.C. May 1, 2019) ("[i]n considering whether the Debtor is dedicating her projected disposable income to the … Plan, it may judicially determine under § 1325(b)(2) what expenses are reasonably necessary to be expended rather than apply the means test").

Here, given that Debtor has recently moved to Israel to live with and care for his ailing mother, the following are best estimates for Debtor's reasonable and necessary expenses for his support and maintenance immediately after confirmation of the Plan:

| Monthly Post-Confirmation Expenses | | |
|---|---|---|
| Class 1(B) Mortgage Payment | $ 5,519.60 | See Dkt. No. 294, p. 3 |
| Class 1(C) Mortgage Payment | $ 569.99 | See Dkt. No. 294, p. 4 |
| Paru Rental Expenses and Maintenance | $ 1,000.00 | See Dkt. No. 294, p. 25 |
| Cell Phone | $ 100.00 | See Dkt. No. 294, p. 25 |
| Vehicle Insurance (Cars in United States) | $ 315.04 | See Dkt. No. 294, p. 25 |
| Public Transportation Expense (In Israel) | $ 100.00 | See Dkt. No. 294, p. 25 |
| Personal and Other Expenses | $ 243.96 | See Dkt. No. 294, p. 25 |
| **TOTAL** | **$ 7,848.59** | |

At this time, and based on currently available estimates, Debtor anticipates that the reasonable and necessary expenses for his support and maintenance immediately after confirmation of the Plan would be approximately $7,848.59.

**3.      Calculation of "Projected Disposable Income"**

Pursuant to section 1325(b)(2), the calculation of "'disposable income' means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended." 11 U.S.C. § 1325(b)(2).

Here, as set forth in detail in Section III.K1., Debtor has "currently monthly income" of $11,197.83, and as set forth in detail in Section III.K.2. above, Debtor is entitled to deductions for expenses reasonably necessary to be expended in the aggregate amount of not less than $7,848.59, which produces "projected disposable income" of $3,349.24.

**4.      Adjustments to Projected Disposable Income**

As the Supreme Court recognized, if there are changes in circumstances in which the calculation of "current monthly income" under the mechanical approach does not accurately account for post-petition changes in income, the court may take into consideration changes in income (or expenses) that are "known" or "virtually certain" as of the date of confirmation.  See Hamilton v. Lanning, 560 U.S. 505 (2010) ("Consistent with the text of §1325 and pre-BAPCPA practice, ... when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's

income or expenses that are known or virtually certain at the time of confirmation.").

To the extent that <u>Lanning</u> is applicable to section 1129(a)(15), and consistent with this Court's prior decision in <u>In re Silovic</u>, BK Case No. 20-50701-SLJ (Dkt. No. 51, p. 20), "the appropriate way to account for changes in income is not to distort the calculation of CMI, but to take into account such changes in projecting the debtor's disposable income."

Since the Petition Date, the following is a summary of all income that Debtor has earned and received during the Bankruptcy Case:

| Month | Amount | Docket No. |
|---|---|---|
| March 2020 | $1,692.00 | Docket No. 52 |
| April 2020 | $7,645.00 | Docket No. 53 |
| May 2020 | $10,345.00 | Docket No. 55 |
| June 2020 | $7,645.00 | Docket No. 68 |
| July 2020 | $10,395.00 | Docket No. 78 |
| August 2020 | $4,895.00 | Docket No. 102 |
| September 2020 | $7,645.00 | Docket No. 103 |
| October 2020 | $7,645.00 | Docket No. 104 |
| November 2020 | $7,645.00 | Docket No. 106 |
| December 2020 | $7,645.00 | Docket No. 109 |
| January 2021 | $7,645.00 | Docket No. 110 |
| February 2021 | $7,645.00 | Docket No. 113 |
| March 2021 | $9,045.00 | Docket No. 117 |
| April 2021 | $7,645.00 | Docket No. 141 |
| May 2021 | $8,995.00 ($1,350 from EDD) | Docket No. 267 |
| June 2021 | $6,695.00 ($1,350 from EDD) | Docket No. 268 |
| July 2021 | $7,595.00 ($2,700 from EDD) | Docket No. 269 |
| August 2021 | $11,195.00 ($1,800 from EDD) | Docket No. 270 |
| September 2021 | $19,545.00 ($450 from EDD) | Docket No. 271 |
| October 2021 | $4,895.00 | Docket No. 277 |
| November 2021 | $9,895.00 | Docket No. 278 |
| December 2021 | $9,895.00 | Docket No. 293 |
| January 2022 | $14,895.00 | Docket No. 296 |
| February 2022 | $16,395.00 | Docket No. 301 |
| March 2022 | $9,895.00 | Docket No. 322 |
| April 2022 | $10,804.00 | Docket No. 332 |
| May 2022 | $13,750.00 | Docket No. 347 |
| June 2022 | $10,647.25 | Docket No. 361 |
| July 2022 | $3,000.00 | Docket No. 362 |
| **TOTAL** | **$263,273.25** | |
| **MONTHLY AVERAGE** | **$9,078.39** | |

As such, it "known" or "virtually certain" that the calculation of "current monthly income" pursuant to section 101(10A) in the aggregate amount of $11,197.83 is substantially higher than the actual income that Debtor earned and derived over the prior 29 months in this Bankruptcy Case (average of $9,078.39 / month), such that the calculation of "projected disposable income" ($3,349.24) should be adjusted downward in the aggregate amount of $2,119.44 ($11,197.83 - $9,078.39) consistent with the

standards set forth in Lanning.

In the event that the Court determines Lanning is applicable in Chapter 11, then Debtor's projected disposable income for purposes of section 1129(a)(15) would be reduced to $1,229.80 ($3,349.24 [actual] - $2,119.44 [Lanning adjustment]) on a monthly basis.

### 4. Disbursement to General Unsecured Creditors

In order to satisfy the requirements of section 1129(a)(15)(B), the *value of the property* to be *distributed under the plan* must be *greater than* the "*projected disposable income*" of Debtor for a 5-year period (or during the plan payment period, if longer). See 11 U.S.C. § 1129(a)(15)(B).

Pursuant to the terms of the Plan, Class 2 claimants will receive at least $525,000 from the net proceeds of sale from the Layfette Property. See Dkt. No. 294, pp. 5-6. However, as of the date this brief, counsel for Debtor (The Fuller Law Firm, P.C.) is holding net proceeds of sale of $530,083.63, which in addition to $10,000 (from sale of the Napa Property) and the residue of the estate, will be payable to Class 2 claimants. See Dkt. No. 341. As such, it is anticipated that Class 2 claimants will receive at least $540,083.63 pursuant to the Plan, and perhaps more. See Dkt. No. 294, pp. 5-6.

Here, the Plan Proponents clearly satisfy the requirements of section 1129(a)(15)(B), as the Joint Plan proposes to pay Class 2 claimants at least $540,083.63, which is significantly more than Debtor's "projected disposable income" ($3,349.24) over a 60-month period ($200,954.40), or if Lanning is applicable, the adjusted "projected disposable income ($1,229.80) over a 60-month period ($73,788.00).

"Where § 1129(a)(15) is applicable, 'Congress made clear that a chapter 11 plan of any length may be confirmed as long as the value of the property to be distributed is not less than the projected disposable income of the debtor to be received over five years (or the length of the plan, whichever is longer).'" In re Zimont, 2020 WL 2373591, at *4 (Bankr. D. Ariz. 2020) (*citing* Baud v. Carroll, 634 F.3d 327, 340 (6th Cir. 2011); see also Randolph J. Haines, *Chapter 11 May Resolve Some Chapter 13 Issues*, 8 Norton Bankr. L. Adviser 1 (August 2007).

Further, and although not necessary, the plain language of section 1129(a)(15)(2) also authorizes the Plan Proponents to include other amounts distributed under the Plan, including but not limited to, payment to the claim of the 1st Deed of Trust for the Layfette Property ($1,057,229.26), payment of all administrative claims ($94,717), and payment of all capital gains tax ($167,514). See In re Crowe, 2021

WL 2212005, at *10 (the Court is required to "compare the debtor's projected disposable income to the value of all property that is to be distributed 'under the plan,' not just the value of the property to be distributed to general unsecured creditors.").

Based on the foregoing, in the Plan, the Plan Proponents propose to distribute at least $1,859,543.89 to all creditors, which is significantly more than Debtor's "projected disposable income" of $200,954.40 (or $73,788.00 if <u>Lanning</u> is applicable) over a 60-month period, and as such, the Plan Proponents clearly satisfy the requirements of section 1129(a)(15)(B).

The preponderance of all evidence proffered by the Plan Proponents clearly demonstrates this conclusion, and since the Hannas did not specifically object to confirmation of the Plan pursuant to section 1129(a)(15), which would initiate a contested matter, the Court need not engage in a protracted evidentiary hearing to determine compliance with section 1129(a)(15)(B) in this matter.

### L. Appointment of Disbursing Agent

As set forth in detail in Part 8 of the Plan, Debtor and the Gardners elected to appoint the very experienced fiduciary Janina Hoskins, whom currently serves as a panel Chapter 7 Trustee in the San Francisco Division, to act as the Disbursing Agent to take all necessary actions and make all required disbursements under the terms of the Plan. <u>See</u> Dkt. No. 294, Part 8. The Plan Proponents have been in regular contact with Ms. Hoskins, whom is up-to-date with recent developments in the Bankruptcy Case, and it is anticipated that Ms. Hoskins is ready, willing, and able to accept appointment as the Disbursing Agent in the event that the Plan in confirmed.

### M. Discharge of Debtor

Consistent with the requirements of section 1141(d)(5), pursuant to Part 5(a) of the Plan, Debtor is entitled to entry of his discharge upon payment by the Disbursing Agent and/or Debtor of all payments required by the Plan. <u>See</u> 11 U.S.C. § 1141(d)(5)(A). The Plan does not seek to alter or modify the requirements of the delayed entry of discharge for an individual debtor in Chapter 11. <u>See</u> Dkt. No. 294, Part 5(a).

### N. Resolution of All Related Litigation

To the extent that the Plan is confirmed, a significant amount of litigation will also be resolved, which inevitably will conserve valuable judicial resources, reduce administrative expenses of the estate,

and allow Debtor the opportunity to obtain a discharge and a fresh start.

First, the Gardners initially objected to Debtor's claimed homestead exemption ($75,000) in the Acalanes Property.  See Dkt. No. 145.  Although this objection has not yet been resolved, and the Hannas joined and adopted all arguments raised by the Gardners, it will not be necessary for the Court to resolve this objection.  Specifically, to the extent that the Plan is confirmed, Debtor has agreed to waive his homestead exemption ($75,000) and allow for all net proceeds of sale from the Acalanes Property to be distributed to Class 2 general unsecured creditors.

Second, the Gardners have commenced an adversary proceeding against Debtor and objected to the dischargeability of their claim pursuant to sections 523(a)(2), (a)(4), (a)(6).  See Case No. 20-5030.  However, as an accommodation to Debtor, the Gardners have voluntarily agreed to dismiss this adversary proceeding *with* prejudice if the Plan is confirmed.

These natural and intended consequences of confirmation of the Plan are clearly in the best interest of the estate and all creditors, and the totality of the circumstances bolsters that the Plan was proposed in good faith consistent with the requirements of section 1129(a)(3) as set forth above.

## IV.  CONCLUSION

Based on the foregoing, Debtor and the Gardners respectfully request that the Court enter an order confirming the Plan, overrule the Objection submitted by the Hannas in its entirety, and for such other and further relief that is just and proper under the circumstances of this case.

Respectfully submitted,

Dated: October 3, 2022          **MEYER LAW GROUP LLP**

By: /s/ BRENT D. MEYER
     Brent D. Meyer, Esq.
     Attorneys for Plan Proponents
     DALE GARDER AND MELISSA GARDNER

Dated: October 3, 2022          **THE FULLER LAW FIRM, PC**

By: /s/ LARS FULLER
     Lars Fuller, Esq.
     Attorneys for Debtor
     MORDECHAI KOKA